James A. WATSON, Pamela D. Seay, Anthony A. Williams, Donald L. Pennington, Barry Eaton, Chris M. Nechodom, Luther G. Rowland, III, Charles A. Streat, Karvin T. Rodgers, Frank Morales, Douglas P. Acres, Cornell J. Jefferson and Clifton E. Carney, Petitioners,

v.

DEPARTMENT OF THE NAVY, Respondent.

No. 00–3387.

United States Court of Appeals, Federal Circuit.

Aug. 17, 2001.

---

Neil C. Bonney, Bonney & Allenberg, P.C., of Virginia Beach, VA, argued for petitioners. Of counsel was Michele W. Snyder.

John C. Einstman, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Bryant G. Snee, Assistant Director. Of counsel on the brief was Cynthia W. Clark, Attorney, HROC Office of Counsel, Department of the Navy, of Washington, DC.

Peter B. Broida, Arlington, VA, amicus curiae for Fraternal Order of Police.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

MICHEL, Circuit Judge.

James A. Watson *et al.* petition for review of the July 17, 2000 final decision of the Merit Systems Protection Board ("Board"), sustaining the Department of the Navy's ("Navy" or "agency") determination that petitioners did not satisfy the statutory and regulatory criteria for early retirement coverage as law enforcement officers ("LEO") under the Civil Service Retirement System ("CSRS"), 5 U.S.C. § 8336(c) (1994), or the Federal Employees' Retirement System ("FERS"), 5 U.S.C. § 8412(d) (1994). *Watson v. Dep't of the Navy,* 86 M.S.P.R. 318 (2000). The petitioners are thirteen current or former police officers employed by the Navy at the Norfolk Naval Base in Norfolk, Virginia. In upholding the Navy's denial of the officers' applications for LEO retirement credit, the Board employed a new approach that more affirmatively considered the reasons for the creation and existence of the positions than it had used in its prior LEO decisions, which emphasized the officers' actual, even if incidental or occasional, duties. *Id.* at 321. In this case, after reviewing the Office of Personnel Management ("OPM") classification standards for the GS–083 Occupation Series to which the officers belonged, a December 1997 "Grade Evaluation Guide for Police and Security Guard Positions GS–0083/GS–0085" ("the Guide") published by OPM, the Position Description for the officers' positions, and the duties actually performed by the officers on a regular and recurring basis, the Board concluded that the officers' positions did not exist primari-

ly for the purpose of investigating, apprehending, or detaining individuals suspected or convicted of federal offenses. *Id.* at 328; *see also* 5 U.S.C. §§ 8331(20), 8401(17) (1994). We hold that the approach used by the Board is consistent with the statutes and regulations of the LEO retirement coverage program, and that it does not conflict with our decision in *Bingaman v. Department of the Treasury,* 127 F.3d 1431 (Fed.Cir.1997), or with its own decision in the same case. We also hold that under this approach, the Board's determination that these Norfolk Naval Base police officers did not satisfy the definition of a LEO was free of legal error and supported by at least substantial evidence. Therefore, we affirm.

## Background

Congress established a special retirement system in order for federal employees in certain positions to retire at an unusually early age. Either of two statutes governs entitlement to such special retirement coverage. Under both the CSRS and FERS, an employee who qualifies for LEO retirement credit is eligible to retire upon attaining the age of 50 and after completing 20 years of eligible LEO service. *See* 5 U.S.C. §§ 8336(c), 8412(d)(2). Additionally, under the FERS, a LEO can retire at any age after completing 25 years of service. 5 U.S.C. § 8412(d)(1). This is far earlier than the age at which most civil service employees are eligible to retire, and is based on shorter service. 5 U.S.C. § 8336(c) (1994). An employee qualifying for LEO retirement receives a larger annuity than ordinary civil service employees, but is subject to larger salary deductions during his or her employment. A LEO may also be subject to mandatory early retirement. *See* 5 U.S.C. §§ 8335, 8425 (1994). An employee can qualify for LEO retirement credit either by serving in a position that has been approved as such, or by applying

for LEO credit and satisfying the employing agency that he or she is entitled to LEO retirement credit because his or her actual duties primarily involve pursuing or detaining criminals. *See* 5 C.F.R. §§ 831.903–.906, 831.910(a), 842.803–804, 842.807(a) (1994).

The CSRS and the FERS prescribe somewhat different standards for determining whether an employee may be eligible for LEO retirement credit. In order to be eligible under the CSRS, the duties of the employee's position must be "primarily the investigation, apprehension, or detention of individuals suspected or convicted of [federal] offenses." 5 U.S.C. §§ 8331(20), 8401(17)(A)(ii). The standard for LEO eligibility under the FERS adds the further requirement that the duties of the position be "sufficiently rigorous that employment opportunities are required to be limited to young and physically vigorous individuals." 5 U.S.C. § 8401(17).

All petitioners, with the exception of Mr. Rowland, were assigned to the patrol division; Mr. Rowland was assigned to the traffic division. The parties had stipulated that the officers were authorized to carry firearms, had arrest authority, were required to maintain a level of physical fitness by passing an annual physical fitness test if hired after March 1991, had interrogated witnesses and suspects, and had given *Miranda* warnings, and in the case of military suspects, warnings under Article 31 of the Uniform Code of Military Justice.

The Navy denied the officers LEO early retirement credit. The officers filed two separate appeals to the Board, since two of the officers were covered under the CSRS, and the remaining eleven officers were covered under the FERS. On July 12–16, and August 2–3, 1999, the Administrative Judge ("AJ") conducted a consolidated hearing. In initial decisions dated September 3 and 17, 1999, the AJ reversed the final decision of the Navy, and held that

the officers were entitled to LEO retirement credit. *See Watson v. Dep't of the Navy,* DC–0842–99–0483–I–1 (Sept. 3, 1999) (discussing FERS); *Jefferson v. Dep't of the Navy,* DC–0831–99–0482–I–1 (Sept. 17, 1999) (discussing CSRS). The full Board consolidated the *Watson* and *Jefferson* appeals, and granted the agency's petition for review.

On July 17, 2000, the Board reversed the AJ's initial decisions, and held that the officers were not entitled to LEO retirement credit. The Board noted that in its prior cases, it had placed too much emphasis on the duties performed by a particular applicant over a limited period of time, with too little emphasis on the purpose of the applicant's position. *Watson,* 86 M.S.P.R. at 320–21. Using that approach, the Board previously held that Norfolk Naval Base police officers in the same series as petitioners here (the 083 series) were entitled to LEO retirement credit. *Id.* (citing *Bremby v. Dep't of Navy,* 81 M.S.P.R. 450 (1999); *Hamilton v. Dep't of Defense,* 85 M.S.P.R. 409 (2000)).[1] In order to be more faithful to the language of the statutes and the regulations, the Board expressly adopted a new "position-oriented approach" that would "more affirmatively" assess the "basic reasons for the existence of the position," as required by OPM regulations, 5 C.F.R. §§ 831.902, 842.802 (1994).[2] *Id.* at 321. Under this new approach, the Board stated that "if the position was not created for the purpose of investigation, apprehension, or detention, then the incumbents of the position would not be entitled to LEO credit." *Id.* In

determining the reasons for the existence of the position, the Board considered all available evidence, including OPM classification standards, the OPM Guide, the Position Description, and the duties actually performed by the officers on a near daily basis. *Id.* at 328. After reviewing that evidence, the Board concluded that the petitioners' positions did not exist primarily for the purpose of investigating, apprehending, or detaining those suspected or convicted of federal offenses. *Id.* On the contrary, it held that the officers' primary duties were maintaining law and order, protecting life and property, and guarding against potential violations of law. *Id.* at 329. It therefore sustained the agency's decision that the officers were not entitled to LEO credit. *Id.*

The police officers filed a timely petition for review to this court under 5 U.S.C. § 7703 (1994). On appeal, petitioners and amicus, the Fraternal Order of Police, argue that the Board's approach represents a "sweeping policy change" that reverses the approach previously adopted by this court in *Bingaman* in analyzing LEO retirement coverage cases, and that is contrary to the statutes and the regulations governing LEO eligibility. We heard oral argument on June 6, 2001, and have jurisdiction under 28 U.S.C. § 1295(a)(9) (1994).

### Analysis

**A. Requirements for LEO Retirement Credit**

 Federal police officers are only eligible for early retirement credit under

---

**1.** The Board also notes that in others cases involving police officers in the GS–083 series, it did *not* hold that the GS–083 police officers were entitled to LEO credit. *Watson,* 86 M.S.P.R. at 323 n. 3 (noting that appeals at different times, in different legal postures, and with different evidentiary records ... "to potentially inconsistent results"); *see also Fitzgerald v. Dep't of Defense,* 80 M.S.P.R. 1

(1998), *aff'd,* 230 F.3d 1373 (Fed.Cir.1999) (holding that officers in the GS–083 series were not entitled to LEO credit).

**2.** Section 831.902 applies to CSRS determinations; section 842.802 applies to FERS determinations. Both regulations are worded identically.

the CSRS or FERS if they meet the statutory definition of a LEO. Both statutes define an LEO as one who holds a position, the "primary duties" of which involve the "investigation, apprehension, or detention" of those suspected or convicted of federal offenses. 5 U.S.C. §§ 8331(20), 8401(17). By regulation, OPM has defined "primary duties" in a three-part test. "Primary duties" are those duties that:

i. Are paramount in influence or weight, that is *constitute the basic reasons for the existence of the position;*

ii. Occupy a substantial portion of the individual's working time over a typical work cycle; *and*

iii. Are assigned on a regular and recurring basis.

5 C.F.R. §§ 831.902, 842.802 (emphasis added). In general, if an employee spends at least fifty percent of his or her time performing certain duties, those duties are his or her primary duties. *Id.* Under the regulations, "[d]uties that are of an emergency, incidental, or temporary nature cannot be considered 'primary' even if they meet the substantial portion of time criterion." *Id.* Further, the regulations state that the definition of a LEO "does *not* include an employee whose primary duties involve maintaining order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than those who are suspected or convicted of offenses against the criminal laws of the United States." *Id.* (emphasis added). The police officers seeking LEO retirement coverage bear the burden of proving entitlement by preponderant evidence. 5 C.F.R. § 1201.56(a)(2). Eligibility for LEO retirement coverage must be "strictly construed," because the LEO retirement program is " 'more costly to the government than more traditional retirement plans and often results in the retirement of important people at a time

when they would otherwise have continued to work for a number of years.' " *Bingaman,* 127 F.3d at 1435 (quoting *Morgan v. Office of Pers. Mgmt.,* 773 F.2d 282, 286–87 (Fed.Cir.1985)).

## B. The Board's Approach

Petitioners and amicus argue that the approach used by the Board places too much reliance on the reason why the position was initially created. In its prior cases, petitioners note, the Board and this court in *Bingaman* had undertaken a fact-specific inquiry into the daily or frequent duties actually performed by the officer seeking LEO coverage, even if those duties were not listed in the Position Description as primary duties. Petitioners argue that the new "position-oriented" approach relies excessively on broad and unclear OPM classification standards and the Position Description in order to determine why the position was originally created many years ago, without sufficient examination of the regular duties actually performed by the particular employee. This approach, petitioners contend, is contrary to the plain language of the statutes creating the LEO retirement program, and conflicts with our decision in *Bingaman.*

The government argues that the approach used by the Board is permissible, and is more faithful to the statutes and the regulations than its earlier approach. As noted by the Board in this case, the approach formerly used by the Board in cases such as *Bremby* permitted an employee to be deemed eligible for LEO retirement credit so long as he or she could show that to some unspecified degree his or her primary duties "involve" the investigation, apprehension, or detention of those suspected or convicted of federal offenses, even if the employee's primary duties consist of non-LEO duties, such as maintaining law and order or protecting life and property. The *Bremby* approach, the gov-

ernment argues, ignored the first criterion of 5 C.F.R. §§ 831.902, 842.802, which defined the term "primary duties" to require an assessment of the "basic reasons for the existence of the position." 5 C.F.R §§ 831.902, 842.802.

### 1. Consistency with Statutes and Regulations

 We hold that the approach used by the Board in this case is indeed consistent with the statutory and regulatory criteria for LEO retirement credit. The express language of the regulations promulgated under the CSRS and FERS statutes provides support for considering the reason for the position's "existence" as part of the LEO-eligibility analysis. A LEO is defined in both the CSRS and the FERS statutes as one "the duties of whose *position*" are "primarily" the "investigation, apprehension, or detention" of those suspected or convicted of federal offenses. 5 U.S.C. §§ 8331(20), 8401(17) (emphasis added). Thus, under the statutes, an employee may only receive LEO retirement credit if the *position* he or she occupies primarily involves certain specified duties.

Moreover, the Board's approach is consistent with OPM regulations. The inclusion of the conjunctive "and" in sections 831.902 and 842.802 clearly indicates that all three criteria must be demonstrated in order for a position to be LEO-eligible. The 6 factor *Bingaman* test only considered prongs (ii) and (iii) to determine whether the officers' duties occupied a "substantial portion" of their working time (prong (ii)), and were assigned on a "regular and recurring basis (prong (iii))." [3]

The approach used by the Board here affirmatively involves consideration of prong (i) of sections 831.902 and 842.802 so as to ensure that in addition to consisting of duties that occupy a substantial portion, if not 50 percent or more, of the officer's working time and that occurred on a regular and recurring basis, the position exists currently as a LEO position.

 Placing emphasis on why the position exists is also consistent with the legislative intent in providing for the LEO retirement program: to limit LEO-eligibility to rigorous positions that retirement at an unusually early age is appropriate. A Senate Report stated that LEO positions should be "composed, insofar as possible of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the federal service." S.Rep. No. 93–948, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699. Accordingly, Congress established maximum retirement ages for LEO employees such as FBI Special Agents and for employees serving in other positions which are statutorily entitled to LEO retirement coverage. *See* 5 U.S.C. §§ 8335, 8425. LEO employees, for instance, are often required to retire no later than between 55 and 57 years of age, or when they have accrued twenty years of creditable service if they are beyond those ages when they completed the twenty years. *See id.* Congress further has authorized an agency head to determine and fix minimum and maximum limits of age within which an original appointment may be made to a LEO position. *See* 5 U.S.C. § 3307(e) (1994). For instance, all Department of Justice LEO po-

---

**3.** Under the six *Bingaman* factors, an LEO "commonly 1) has frequent direct contact with criminal suspects; 2) is authorized to carry a firearm; 3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; 4) works for long periods without a break; 5) is on call 24 hours a day; and 6) is required to maintain a level of physical fitness." *Bingaman*, 127 F.3d at 1436 (citing *Hobbs v. Office of Pers. Mgmt.*, 58 M.S.P.R. 628 (1993)).

sitions have a maximum entry age of 37, which may be waived for applicants up to 40 years of age. In assessing why the position exists, factors such as an early mandatory retirement age and a maximum entry age should be considered in determining whether the "basic reasons for the existence of the position" consists of duties that will make the employee LEO-eligible. Examination of such factors will be quite probative in determining whether the position really exists as a LEO position, that is, its job description and actual duties consist of tasks that only a young and physically fit individual could perform.

The dissent concludes that the Board improperly "treated the purpose of the 'existence' of the position . . . as turning on the basic reasons for the position's 'creation.' "[4] Although in several places, including the concluding paragraph, the Board's opinion misstates the law as requiring that the position be "created" primarily for the performance of LEO duties, the Board's examination of the duties actually performed by the officers demonstrates that it knew it had to determine the reasons why the position existed at the time of application for LEO credit, not merely when it was originally created. As noted by the dissent, early in its opinion, the Board stated that under its new, position-oriented approach, "if the position was not created for the purpose of investigation, apprehension, or detention, then the incumbents of the position would not be entitled to LEO credit." *Watson,* 86 M.S.P.R. at 321. Significantly, however, the Board did not stop there. It went on to state in the very next sentence:

> This is not to say that the Board will not consider evidence of what duties the appellants performed from day-to-day in

the GS–083 Police Officer position. Rather, the Board will consider that evidence, along with all of the other evidence of record, to ascertain whether the appellant is entitled to LEO retirement coverage.

*Id.* This statement indicates that the Board knew that even if the official documentation of the position's creation did not support an applicant's LEO eligibility, the Board still needed to inquire into the applicant's actual duties as alleged. Moreover, in describing why it was departing from the *Bremby* approach, the Board specifically noted that its new approach would "more affirmatively take into account the *basic reasons* for the *existence* of the position." *Id.* (emphases added).

The Board's approach included consideration of both the position documentation and actual duties. First, the Board determined the purpose for the creation of the officers' position in the GS–083 series. *Id.* This is an altogether logical and proper place to begin. In doing so, it considered the OPM Classification Standards, the OPM Guide, and the Position Description. *Id.* at 323–26. It found that, as created, the position was not LEO-eligible. *Id.* at 326. The Board next determined whether the purpose for the position changed, *i.e.,* whether the purpose for the position's existence was different than the purpose for its creation. *Id.* at 321. In doing so, it considered-in equivalent detail and at an equivalent length of its treatment of position documents-the testimony regarding the officers' actual, day-to-day duties. *Id.* It found that the basic reasons for the position's existence were not different from those for its creation, and thus, that the officers were not LEO-eligible. *Id.* at

---

4. The dissent believes that the Board looked exclusively at why the position was created. The dissent states, "the reasons for the existence of the position cannot be based solely upon the historical reasons for the creation." This premise is crucial to the dissent's conclusion that the Board applied the wrong legal standard.

328. This second step was also proper and necessary, as the Board clearly understood. In concluding its analysis, the Board stated: "While an incumbent's actual duties are relevant ... the evidence of the actual duties performed in these cases does not persuade us that—contrary to the official documentation of the position—'the basic reasons for the existence of the position' was [sic] actually investigation, apprehension, or detention." *Id.* If the Board believed that eligibility for LEO retirement credit is determined solely by the reasons for the position's creation, it would not need to consider, much less devote equivalent treatment to, the testimony regarding the officers' day-to-day duties. Nor did it consider actual duties only as an alternative ground for decision. Indeed, the Board specifically noted that its new position-oriented approach did not foreclose other officers in the GS–083 series from showing that the basic reasons for the existence of their positions had shifted from peace-keeping to the investigation, apprehension, or detention of criminals or suspects. *Id.* at 330 n. 7.

We note that footnote 7 of the Board's opinion, like the concluding paragraph, incorrectly states the law as requiring that applicants "must show that the position was created as an LEO-position." *Id.* However, the portion of the Board's opinion explaining its analysis reflects that it correctly understood that the reasons for the position's *existence,* not merely its creation, are determinative. Such reasons could be shown by proof that the duties an employee performs day-to-day differ from those of the OPM classification standards, the OPM Guide, or the Position Description. *Id.* at 321; *see also Ellis v. United States,* 222 Ct.Cl. 65, 610 F.2d 760 (1979) (finding that the duties actually performed by the officer were not properly set forth in their position description, and thus granting a retirement annuity under 5 U.S.C. § 8331(21)). By providing this al-

ternative way to show entitlement to LEO credit, the Board necessarily concluded that the reasons for the existence of the position can be established not only by the position papers but also by actual duties performed. Thus, contrary to the dissent's suggestion, we conclude that the Board applied the correct legal standard. The Board's analysis properly included the reasons for the position's existence, and not merely its creation.

### 2. Consistency with *Bingaman*

■ The Board's approach is also wholly consistent with the approach taken by this court in *Bingaman.* Petitioners seem to read *Bingaman* to require a rigid, bright-line test based on the six factors of the Board's decision. Petitioners also argue that other factors-such as whether the officers' duties are commensurate with Norfolk City police officers-should be considered as well. This court, however, has never adopted the *Bingaman* factors; nor has the court held that federal employees are always entitled to LEO coverage so long as they satisfy the *Bingaman* factors. Indeed, as noted in *Bingaman* and *Hannon v. Department of Justice,* 234 F.3d 674 (Fed.Cir.2000), the *Bingaman* factors were developed by the Board, *not by this court* as "captur[ing] the essence of what Congress intended." *Bingaman,* 127 F.3d at 1436; *Hannon,* 234 F.3d at 677–78 (noting that in *Bingaman,* this court "merely recognized and applied the [*Bingaman*] factors," factors which had been "developed" by "the Board, not this court"). In examining the duties performed by these petitioners, the *Bingaman* court only addressed prongs (ii) and (iii) of 5 C.F.R. §§ 831.902, 842.802. *Bingaman,* 127 F.3d at 1436 ("Applying [the *Bingaman* factors], the [AJ] properly found that Bingaman failed to establish that he is eligible for LEO retirement credit."). The court did not need to consider prong (i) of the

test—examining the basic reasons for the existence of the position—because the court found that the petitioners had failed to meet their burden of proof regarding the second and third prongs of 5 C.F.R. §§ 831.902, 842.802.

Moreover, some of the most probative factors are not even a part of the six-factor *Bingaman* test. *Hannon*, 234 F.3d at 678. For instance, in *Hannon*, this court held that the Board should consider hazard as a probative factor in assessing LEO retirement coverage. *Id.* at 679 ("The Board has recognized . . . that hazard is a significant element of law enforcement work."). Moreover, in light of evident legislative intent to grant LEO credit only to those who have jobs requiring physically demanding work, other factors, such as whether the officer must retire at an early age or whether there is an early maximum entry age, would also be highly probative in determining whether the officer is entitled to LEO retirement credit. Indeed, while all of the *Bingaman* factors may always be considered, some are more probative than others. For example, whether the job requires an annual physical fitness test may be probative in assessing whether the position is designed to be limited to young and physically fit individuals who would be forced to retire at an unusually early age, depending on the stringency of the test. Other *Bingaman* factors, however, are normally less probative because they do not always distinguish between officers who do LEO work and those who do not. For example, guards mainly protecting life and property and police officers whose jobs primarily involve pursuing or detaining criminals all might carry a firearm, be on call 24 hours a day, or have to work long periods without taking a break. The regulations, however, specifically exclude guards who mainly protect life and property from LEO retirement coverage. *See* 5 C.F.R. §§ 831.902, 842.802. Other factors, proposed by petitioners, have little relevance. For instance, that petitioners' positions are equivalent to those of Norfolk City police officers has little probative value because not all Norfolk City police officers would be entitled to LEO credit if they were federal employees.

## C. Determining LEO Eligibility for these Norfolk Naval Base Police Officers

In this case, the Board held that petitioners' applications for LEO retirement credit were properly denied, because the relevant evidence of record (including OPM classification standards, the OPM Guide, the Position Description, and the testimony detailing the officers' daily or frequent duties) did not show that the GS–083 police officer position was "created for the basic reason" of conducting LEO activities.[5] *Watson*, 86 M.S.P.R. at 328–29. The Board's review of the "primary duties" of the officers as detailed in official documentation and in their testimony before the AJ, and the fact that the officers' positions were neither limited by an early mandatory retirement age nor a youthful maximum entry age all support the Board's conclusion that these Norfolk Na-

---

**5.** Under the FERS statute, the duties of the position must be "sufficiently rigorous that employment opportunities are required to be limited to young and physically vigorous individuals." 5 U.S.C. § 8401(17)(A)(ii). The Board noted that because the evidence showed that the duties of the Norfolk Naval Base police officers were not primarily the investigation, apprehension, or detention of persons convicted or suspected of criminal offenses, it need not consider whether the duties of the *Watson* petitioners met the "sufficiently rigorous" requirement under the FERS. *Watson*, 86 M.S.P.R. at 321 n. 2. We see no error in this approach, which, we note, has the virtue of judicial efficiency.

val Base police officers are not entitled to LEO retirement credit.

 In order to determine that an officer is entitled to LEO retirement credit, the officer must show that the *primary* duties of his or her position, as defined by 5 C.F.R. §§ 831.902, 842.802, are the investigation, apprehension, and detention of criminals or suspects. The most probative factors, we hold, are: 1) whether the officers are merely guarding life and property or whether the officers are instead more frequently pursuing or detaining criminals; 2) whether there is an early mandatory retirement age; 3) whether there is a youthful maximum entry age; ·4) whether the job is physically demanding so as to require a youthful workforce; and 5) whether the officer is exposed to hazard or danger. The six *Bingaman* factors may also be considered as necessary and appropriate.

 Evaluation of those factors in this case supports the Board's conclusion that the petitioners' positions as Norfolk Naval Base police officers did not exist primarily for the purpose of investigating, apprehending, or detaining criminals or suspects. Individuals applying for a position as a Norfolk Naval Base police officer, unlike LEO appointments in many other departments, are not required to retire at an early age; nor are officers required to satisfy certain maximum entry age requirements. An officer could conceivably enter the Norfolk Naval Base police force at age 50, and retire at age 70. This hardly seems to be consistent with awarding LEO retirement credit only for those positions which are so physically taxing as to warrant retirement after 20 years of service.

The official documentation of the officers' position provides further support that the position was not designed to be LEO-eligible. The OPM classification standards for GS-083 officers supports the Board's conclusion that the Norfolk Naval Base police officers do not satisfy the definition of an LEO. The standards state that the "primary mission and purpose of police organizations is to enforce law, maintain law and order, preserve the peace, and protect the life and civil rights of persons." OPM Classification Standards for the GS-083 Occupation Series, Occupational Information at 2-4. The OPM classification standards also state that "[m]ost police officers are engaged in patrol duties and/or traffic control." *Id.* Those duties are specifically designated by the OPM regulations to be non-LEO duties. 5 C.F.R. §§ 831.902, 842.802. The OPM Guide reiterates the point made by the OPM Classification Standards that "[t]he primary mission of police officers in the Federal service is to maintain law and order." Although noting that the "distinction between police and guard work may not be an easy one to make," the Guide differentiates between police officers who are eligible for LEO credit and guards who are not. For instance, the Guide notes that Criminal Investigators in the GS 1811 series are eligible for LEO credit because the series consists of "[p]ositions primarily responsible for investigating alleged or suspected major offenses or violations of specialized laws of the United States." As noted by the Board, "[t]his clarification sets forth OPM's view that, unlike positions in the GS-1811 series, the primary duties of positions in the GS-083 Police Officer series are *not* the investigation or apprehension of persons suspected or convicted of offenses against the criminal laws of the United States." *Watson,* 86 M.S.P.R. at 325 (emphasis added).

The Position Description also supports the Board's conclusion that these Norfolk Naval Base police officers are not entitled to LEO retirement coverage. The introduction to the Position Description states that the police officers "provide[ ] com-

munity policing, law enforcement, and security for the investigation of crimes, [and] protection of life and property." The section of the Position Description entitled "Major Duties and Responsibilities" states that "[t]he incumbent serves as a Police Officer assigned to a community policing area." It then states, *inter alia*, that the "position requires an incumbent to perform duties that *involve* the investigation, arrest, apprehension or detention of criminals and/or suspected criminals" (emphasis added); significantly, however, the Position Description does not state that the duties are *primarily* the investigation, apprehension or detention of criminals and/or suspected criminals. Other major duties listed in the Position Description include: 1) providing police escorts and directing traffic; 2) serving warrants and issuing summons; 3) making arrests; 4) testifying in court; 5) reporting unsafe conditions existing in the streets and/or public facilities; 6) responding to emergency situations; and 7) conducting preliminary investigations, such as by interviewing witnesses or collecting and preserving evidence.

The Board also properly concluded that the testimony of the officers describing their daily or frequent duties did not show that the officers were entitled to LEO retirement coverage. While the officers testified to some instances involving great danger, the Board concluded that the testimony as a whole showed that the police officers' duties mostly involved being "on the lookout for potential violations of law, conduct[ing] generalized patrols, guard[ing] the gates, check[ing] buildings at night to ensure that they were secure, enforc[ing] traffic laws, and act[ing] as 'first responders' to emergencies or potential crimes." *Id.* at 328. The Board also considered conflicting evidence as to whether at least 50 percent of the officers' duties consisted of LEO-type work. The Board opinion credited the testimony of

Police Commander Hemmingsen, who reviewed the Incident Complaint Reports to determine whether the officers performed LEO duties. *Id.* at 326. Commander Hemmingsen also testified before the AJ that the Norfolk Naval Base police officers did not perform LEO-type work at least 50 percent of the time, as required by sections 831.902 and 842.802. This contradicted the testimony of petitioners' witnesses who testified that their duties were over 50 percent. Substantial evidence thus supports the Board's conclusion that the officers' primary duties were not LEO duties. *Id.* at 328–29.

Indeed, the official documentation of the GS–083 series indicates that all officers in that series in all departments of the federal government are presumptively not entitled to LEO credit. Thus, officers in that series would only be eligible for LEO credit if they could persuade the agency or Board that "contrary to the official documentation of the position," the duties actually performed by the officers on a regular and recurring basis clearly indicate that the "basic reasons for the existence of the position" was the investigation, apprehension, or detention of criminals or suspects. *Id.*

### Conclusion

Under a legally correct construction of the statutes and regulations, a federal police officer seeking LEO early retirement credit must prove that he or she occupied a position that primarily required the investigation, apprehension, or detention of criminals or suspects, rather than merely the protection of life or property, and that their duties were so physically demanding as to necessitate his or her retirement at an unusually early age. The Board held that these Norfolk Naval Base police officers have not proven that their primary duties nor those of their position involved the investigation, apprehension, or deten-

tion of criminals or suspects. The Board's finding is supported by substantial evidence. Further, the Board's method of analysis was consistent with the statutes, the regulations, and the case law. Therefore, the Board's decision is

*AFFIRMED.*

FRIEDMAN, Senior Circuit Judge, dissenting in part.

I agree with most of what the court says. I part company with it, however, in its analysis and approval of the theory upon which the Board upheld the Navy's denial of law enforcement officer (LEO) status to these employees.

I agree that the Board justifiably adopted its broader "position-oriented" approach in LEO cases as more accurately reflecting the statutory test for LEO status of whether the "duties of [the employee's] position (i) are primarily (I) the investigation, apprehension, or detention" of criminals, 5 U.S.C. § 8401(17)(A), and OPM's implementing regulations that define "primary duties" as duties that, among other things, "(i) [a]re paramount in influence or weight; that is, constitute the basic reasons for the existence of the position," 5 C.F.R. § 831.902. As I read the Board's opinion, however, the Board treated the purpose of the "existence of the position" in the regulatory definition as turning on the basic reasons for the position's "creation."

Early in its opinion the Board stated that under the new "position-oriented" approach it was adopting, "if the position was not created for the purpose of investigation, apprehension, or detention, then the incumbents of the position would not be entitled to LEO credit." 86 M.S.P.R. at 321. After stating that the OPM regulations require that "the 'basic reasons' for the existence of the position must be the performance of LEO duties," the Board stated that the administrative judge "did

not look to see why the agency created the GS–083 Police Officer position, but instead examined whether the appellants' experiences showed that their duties 'involved' some LEO work." *Id.* at 323. The Board ruled that "[t]he classification standards and OPM's Guide for evaluating a GS–083 Police Officer position show that the basic reason for the existence of this position is to maintain order, protect life and property, and guard against or inspect for violations of law." *Id* at 325. It stated that the position's description shows that "the position was created for the primary purpose of maintaining law and order and protecting persons and property by means of community policing and traffic control." *Id.* at 326. It pointed out that there was "evidence showing that the GS–083 Police Officer position at the NNB was not created as an LEO position" and stated that "the evidence of the actual duties performed in these cases does not persuade us that—contrary to the official documentation of the position—'the basic reasons for the existence of the position' was actually investigation, apprehension, or detention." *Id.* at 328–29.

The penultimate paragraph of the opinion, captioned "ORDER," stated:

> For the reasons stated above, we find that the appellants are not entitled to LEO service credit because the GS–05–083 Police Officer position they occupied at the NNB was not created primarily to perform LEO duties as defined by statute. The initial decisions are REVERSED.... [7]

*Id.* at 330.

The Board reiterated the view that LEO status turned upon the reason for the "creation" of the position in footnote 7, where it stated: "individuals who are not parties to these appeals are not precluded in future cases from attempting to show that the basic reason for the creation for the GS–05–083 Police Officer position at the

NNB was the performance of LEO duties ... any future appellants who encumber or did encumber this position must show that the position was created as a LEO position." *Id.*

Although the Board referred three times to the reason for the "existence" of the position, a fair reading of its opinion indicates to me that the critical and controlling factor for the Board in determining LEO status was the reason for the "creation" of the position and not for its "existence," as the regulation provides. The reasons for the creation of a position are not necessarily the same as those for its existence. A position could have been created for non-LEO purposes, but over time the duties could change sufficiently that it continued to exist for LEO purposes. Of course, the reason for the creation of a position may be a significant factor in determining the reasons for its existence. The two concepts are not the same, however, and the reasons for the existence of a position cannot be based solely upon the historical reasons for its creation.

OPM's regulation merely defines one element of the statutory standard governing the existence of LEO status—the meaning of the "primary duties" of the position. The portion of that definition here involved—duties that "constitute the basic reasons for the existence of the position"—is unambiguous. In applying the LEO statute, the Board's responsibility was to apply that definition to the facts of this case, not to reformulate the definition by substituting the concept of the reasons for "creation" of the position for the reasons for its "existence."

I would vacate the Board's decision and remand for the Board to reconsider under the proper standard.