**Jody P. LUKE, Petitioner,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
**Respondent.**

**No. 02–3277.**

United States Court of Appeals,
Federal Circuit.

Feb. 26, 2003.

Jody P. Luke, of New Market, MD, pro se.

Heide L. Herrmann, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, for respondent. With her on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director.

Before RADER, BRYSON, and DYK, Circuit Judges.

BRYSON, Circuit Judge.

Petitioner Jody P. Luke petitions for review of the decision of the Merit Systems Protection Board, which held that he is not entitled to the special retirement benefits provided to law enforcement officers under 5 U.S.C. § 8412(d). Because Mr. Luke failed to satisfy all of the statutory requirements for obtaining law enforcement officer retirement benefits, we affirm the decision of the Board.

I

Since 1989, Mr. Luke has worked as a GS–083 series police officer for the National Institutes of Health ("NIH"), an agency within the Department of Health and Human Services ("HHS"). He is covered by the Federal Employee Retirement System ("FERS"). On August 25, 1991, Mr. Luke was assigned to the Investigations Section of the NIH police.

In 1996, the Director of NIH requested that HHS declare several NIH police officer positions, including Mr. Luke's posi-

tion, eligible for law enforcement officer ("LEO") retirement credit, a form of retirement credit more favorable than the retirement benefits available to civil servants generally. When HHS denied the request, Mr. Luke filed a petition with the Merit Systems Protection Board seeking review of the agency's decision. The administrative judge assigned to the case found that Mr. Luke had not timely requested coverage from HHS and dismissed the appeal for lack of jurisdiction. On Mr. Luke's petition for review of that ruling, the full Board reversed the jurisdictional dismissal and remanded the case for consideration of the merits of Mr. Luke's claim.

On remand, the administrative judge conducted an evidentiary hearing on Mr. Luke's claim that he is entitled to LEO retirement credit for his service as a GS–083–06 and a GS–083–07 police officer in the Investigations Section of the NIH police. At the hearing, Mr. Luke testified that during the period under consideration, he worked exclusively as an investigator, following up on criminal investigations initiated by uniformed patrol officers. Most of his investigations involved property crimes such as theft, burglary, bad check offenses, and fraud, as there were rarely any violent crimes or robberies on the NIH campus. Mr. Luke described his duties as consisting of interviewing witnesses and suspects, taking statements, visiting crime scenes, giving *Miranda* warnings, preparing charging documents for prosecutions brought by the United States Attorney, preparing and executing search warrants, conducting live surveillance and monitoring surveillance cameras, maintaining custody of evidence, dusting for fingerprints, taking photographs of crime scenes, and obtaining handwriting samples. More specifically, he testified that he interviewed witnesses and suspects once or twice per week, usually in his office. He added that he had prepared

and executed about 20 to 25 search warrants during his eight years in the Investigations Section and had averaged about eight arrests of criminal suspects per year. He further testified that he worked an eight-hour daytime shift, that he was called into work after his shift about once or twice per month, and that he typically worked 10 to 50 hours of overtime in a two-week period. Finally, testimony established that Mr. Luke is authorized to carry a firearm and receives regular training on firearm use, although he has never been required to draw his weapon.

Mr. Luke testified that although he has had to wrestle with criminal suspects about a dozen times since 1991, he has never had to satisfy physical standards or requirements or undergo any kind of physical fitness testing. Mr. Luke did state, however, that he participated in various forms of in-service training that were physical in nature, including handcuffing techniques, defensive tactics, baton usage, and weapons retention. In addition, Mr. Luke provided position descriptions for GS–083–06 and GS–083–07 NIH police officers, both of which state under the heading "Physical Demands" that the officer "must be able to pass a physical exam and physical efficiency battery as required." Documentary evidence and testimony further showed that HHS declined to adopt physical standards or a health maintenance program for NIH police officers covered by the GS–083 classification, including a proposed maximum entry age limit and mandatory retirement age.

Following the evidentiary hearing, the administrative judge affirmed the agency's denial of LEO coverage. She found that although Mr. Luke spent the majority of his time performing criminal investigative duties, those duties did not, for the most part, constitute LEO-type duties. In particular, the administrative judge found that

Mr. Luke had contact with criminal suspects only once or twice a week, and usually in the controlled setting of a scheduled interview in his office. That evidence, the administrative judge concluded, did not establish "the kind of 'frequent direct contact' with criminal suspects that the Board has held indicates an employee's entitlement to LEO coverage." Instead, she explained, Mr. Luke's contacts with criminal suspects were "infrequent, occasional, and incidental."

The administrative judge further found that Mr. Luke did not have to pass an annual physical examination and only occasionally had to wrestle with or chase down suspects. Most of the crimes with which Mr. Luke dealt, the administrative judge held, were property crimes, not crimes of violence. Moreover, the administrative judge determined that much of Mr. Luke's time was spent on tasks such as installing and reviewing film from surveillance cameras, preparing reports, attending meetings, and preparing charging documents or other paperwork, none of which involved physical hazard or contact with criminal suspects. Based on those findings, the administrative judge concluded that "the infrequency of the appellant's contacts with criminal suspects and the very small amount of physical hazard and rigor involved in his work disqualify him from entitlement to LEO credit for his work." According to the administrative judge, Mr. Luke had failed to show that his primary duties on the NIH campus constituted "the frontline law enforcement work, entailing unusual physical demands and hazards, that is required for primary LEO service credit."

Mr. Luke sought review of the administrative judge's decision. The two Board members, unable to agree on the disposition of Mr. Luke's petition for review, issued separate opinions. Because the Board members disagreed as to the disposition, the initial decision of the administrative judge affirming the denial of LEO coverage became the final decision of the Board. *See* 5 C.F.R. § 1200.3(b).

II

To demonstrate entitlement to LEO coverage, a federal employee covered by FERS, such as Mr. Luke, must show that (1) the primary duties of his position involve the investigation, apprehension, or detention of persons suspected or convicted of federal offenses, 5 U.S.C. § 8401(17)(A)(i)(I), and (2) the duties of the position are sufficiently rigorous that employment opportunities should be limited to young and physically vigorous individuals, as determined by the Director of the Office of Personnel Management, 5 U.S.C. § 8401(17)(A)(ii). A similar statutory requirement applies to employees who are covered by the older Civil Service Retirement System ("CSRS"), *see* 5 U.S.C. § 8331(20), except that the CSRS statute does not contain an explicit "rigorous duty" requirement analogous to that found in 5 U.S.C. § 8401(17)(A)(ii).

■ In *Watson v. Department of the Navy*, 262 F.3d 1292 (Fed.Cir.2001), this court held that the determination of LEO eligibility should normally be based on the official documentation for the position, but that if the employee's actual day-to-day duties differ from those set forth in the position description, the actual duties should be considered as well. *See id.* at 1300–01 (holding that LEO eligibility may be demonstrated if "the purpose for the position's existence [i]s different than the purpose for its creation"). *Watson* explained that the factors to be used in that determination are: (1) whether the officer is merely guarding life and property or whether the officer is instead more frequently pursuing and detaining criminals; (2) whether there is an early mandatory

retirement age; (3) whether there is a youthful maximum entry age; (4) whether the job is physically demanding so as to require a youthful workforce; and (5) whether the officer is exposed to hazard or danger. *Id.* at 1303. The *Watson* court concluded that "the official documentation of the GS–083 series indicates that all officers in that series in all departments of the federal government are presumptively not entitled to LEO credit." *Id.* at 1304. Officers in that series would only be eligible for LEO credit, the court explained, "if they could persuade the agency or Board that 'contrary to the official documentation of the position,' the duties actually performed by the officers on a regular and recurring basis clearly indicate that the 'basic reasons for the existence for the position' was the investigation, apprehension, or detention of criminals or suspects." *Id.*

Mr. Luke argues that, unlike in *Watson* and in other previous cases involving federal police officers seeking LEO credit, the principal duties of his position involved the investigation and apprehension of persons suspected of committing federal crimes. He points out that he was not principally engaged in such clearly non-LEO activities as patrolling, traffic control, or guard work. The fact that his contacts with criminal suspects were infrequent and usually took place in controlled settings, he argues, was not the result of his lack of involvement in criminal investigations, but was the result of the relative infrequency and nonviolent nature of offenses committed on the NIH campus.

■ Mr. Luke points to the evidence showing that he spent the bulk of his time investigating federal crimes, albeit mainly nonviolent property crimes. For that reason, he contends that he has overcome the *Watson* presumption that GS–083 police officer positions are not LEO positions, and that he has satisfied the requirement

of 5 U.S.C. § 8401(17)(A)(i)(I) that he show that the duties of his position were primarily "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." It is unnecessary for us to determine whether Mr. Luke has satisfied that requirement, however, because he has failed to show that he satisfied the separate statutory "sufficiently rigorous" requirement that applies to all FERS employees who seek LEO status.

The administrative judge found that Mr. Luke failed to satisfy the requirement of 5 U.S.C. § 8401(17)(A)(ii) that an LEO employee's duties be "sufficiently rigorous that employment opportunities should be limited to young and vigorous individuals." Under the statute, the determination whether a particular position is "sufficiently rigorous" for LEO eligibility purposes is made "by the Director [of OPM] considering the recommendations of the employing agency." *Id.* OPM's regulations, in turn, define a "rigorous position" as one that "has been determined by the employing agency head to be a rigorous law enforcement officer or firefighter position." 5 C.F.R. § 842.803(a). The regulations further provide that the "rigorous position" determination

must be based solely on the official position description of the position in question and any other official description of duties and qualifications. The official documentation for the position should, as soon as is reasonably possible, establish that the primary duties of the position are so rigorous that the agency does not allow individuals to enter the position if they are over a certain age or if they fail to meet certain physical qualifications (that is, physical requirements and/or medical standards), as determined by the employing agency head based on the personnel management

needs of the agency for the positions in question.

*Id.* § 842.804(a).

The evidence shows that HHS considered and specifically rejected a proposal to grant LEO coverage to GS–083 series police officers at NIH, a proposal that would have implemented physical standards and a maximum entry age limit. Moreover, while the relevant position descriptions state that an officer in Mr. Luke's position "must be able to pass a physical exam and physical efficiency battery as required," neither official documentation nor testimony introduced at the hearing before the administrative judge indicated that any such tests were in fact required.

In making its determination that the NIH GS–083 police officer positions were not LEO positions, HHS did not focus separately on the statutory and regulatory "rigorous position" requirement. Nonetheless, HHS concluded that the NIH police officer positions are not "rigorous positions" in that they do not involve "physically demanding" duties, "long and irregular hours under stressful conditions," and "mental acuity and physical agility." That finding, based on the official description of the duties and qualifications for the GS–083 police officer position, constitutes a determination by the agency head that incumbents of that position, including Mr. Luke, did not hold "rigorous law enforcement officer" positions within the meaning of 5 C.F.R. § 842.803(a).

Mr. Luke argues that the agency's conclusion as to the "rigorous position" requirement is contrary to the duties he actually performed on the job, which rendered his position "rigorous" within the meaning of the statute and regulations.

The regulations, which define "rigorous position" by reference to the determination made by the agency head based on the description of the duties and qualifications of the position, cast doubt on whether the agency head's conclusion with respect to the "rigorous position" issue can be challenged on the ground that the actual duties of the position involve rigorous work. In any event, Mr. Luke's actual duties do not show that the nature of the GS–083–06 and GS–083–07 positions at issue in this case satisfied the "sufficiently rigorous" requirement of section 8401(17).

Several of the factors set forth in *Watson* go to the "sufficiently rigorous" requirement, but the evidence that Mr. Luke offered failed to show that any of those factors cut in his favor. The evidence did not show that Mr. Luke was actually subject to a youthful maximum entry age or mandatory early retirement. In addition, while Mr. Luke participated in training that involved physical contact and occasionally wrestled or fought with suspects, there was no evidence that the level of fitness involved in his regular day-to-day duties was so physically demanding as to require a youthful workforce.[1] Nor did the evidence show that Mr. Luke had to pass a regular fitness examination or maintain a particular level of physical fitness. Moreover, there was no evidence that Mr. Luke's duties exposed him to significant hazard or danger, as most of Mr. Luke's contacts with criminal suspects took place in a controlled setting.

Although the "sufficiently rigorous" requirement of section 8401(17)(A)(ii) has the effect of removing many law enforcement positions from LEO coverage, Congress clearly intended to make eligibility for LEO credit restrictive and not to extend

---

1. That training is apparently the "annual in-service physical training" to which Board Member Slavet alluded in her separate opinion. The evidence did not show that the in-service training constituted a test of physical qualifications of the sort referred to in the OPM regulations. *See* 5 C.F.R. § 842.804(a).

the LEO benefits to all persons who work in law enforcement in some capacity. The legislative history of the statute authorizing LEO coverage for CSRS employees emphasized that such positions "should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the Federal Service." S.Rep. No. 93–948, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3699; *see also Watson,* 262 F.3d at 1299. When Congress extended LEO benefits to FERS employees, it made clear that LEO coverage under FERS contains an even "more restrictive definition" than under CSRS. S.Rep. No. 99–166, at 41 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1446. The Senate Governmental Affairs Committee explained that it expected "far fewer positions to be defined as law enforcement positions than under current law [CSRS]. Frequent contact with criminals is an insufficient reason for a

position to be defined as a law enforcement position." *Id.* And this court has held that eligibility for LEO benefits must be "strictly construed" due to the additional cost of LEO retirement coverage that "results in the retirement of important people at a time when they would otherwise have continued to work for a number of years." *Watson,* 262 F.3d at 1298. Because the Board did not commit legal error in analyzing the eligibility requirements for LEO credit, and because Mr. Luke failed to show that his position or his actual duties involved the kinds of physical demands envisioned by the statute for LEO coverage under FERS, we uphold the Board's ruling denying Mr. Luke's appeal.

No costs.

*AFFIRMED.*