# United States Court of Appeals for the Federal Circuit

03-3286, -3330, -3331

LLOYD L. TUNIK,

Petitioner,

and

VERRELL DETHLOFF, THOMAS S. ROBINSON, MARGUERITE
SCHELLENTRAGER, KAREN BAKER, BRYAN BERNSTEIN, and
TELA L. GATEWOOD,

Petitioners,

and

JOSEPH SCHLOSS,

Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent,

and

SOCIAL SECURITY ADMINISTRATION,

Intervenor.

Michael J. Kator, Kator, Parks & Weiser, P.L.L.C., of Washington, DC, argued for petitioners.

Calvin M. Morrow, Attorney, Office of the General Counsel, United States Merit Systems Protection Board, of Washington, DC, argued for respondent. With him on the brief were Martha B. Schneider, General Counsel, and Stephanie M. Conley, Reviewing Attorney.

Douglas K. Mickle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for intervenor. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director. Of counsel on the brief was Shawn S. McGruder, Office of General Counsel, Social Security Administration, of Baltimore, Maryland.

Sally M. Tedrow, O'Donoghue & O'Donoghue LLP, of Washington, DC, for amici curiae Association of Administrative Law Judges, IFPTE, AFL-CIO, et al.

Joyce E. Kitchens, Kitchens/New, L.L.C., of Atlanta, Georgia, for amicus curiae Federal Bar Association.

Appealed from:  United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

03-3286, -3330, -3331

LLOYD L. TUNIK,

Petitioner,

and

VERRELL DETHLOFF, THOMAS S. ROBINSON, MARGUERITE SCHELLENTRAGER, KAREN BAKER, BRYAN BERNSTEIN, and TELA L. GATEWOOD,

Petitioners,

and

JOSEPH SCHLOSS,

Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent,

and

SOCIAL SECURITY ADMINISTRATION,

Intervenor.

_____

DECIDED: May 11, 2005

_____

Before LOURIE, SCHALL, and LINN Circuit Judges.

Opinion for the Court filed by Circuit Judge LINN. Dissenting opinion filed by Circuit Judge SCHALL.

LINN, Circuit Judge.

Lloyd L. Tunik ("Tunik"), Verrell Dethloff et al. ("Dethloff"), and Joseph Schloss ("Schloss") petition for review of the Merit Systems Protection Board's ("Board") dismissal of each of their appeals for lack of jurisdiction. Tunik v. Social Sec. Admin., 93 M.S.P.R. 482 (2003); Dethloff v. Social Sec. Admin., 93 M.S.P.R. 574 (2003); Schloss v. Social Sec. Admin., 93 M.S.P.R. 578 (2003). Their separate appeals were consolidated before this court because there is a common issue among them. Because Tunik's case is moot, we vacate the Board's opinion in his case and remand with instructions to dismiss. Because in the remaining cases the Board erred in attempting to repeal by adjudication its rule adopted pursuant to notice and comment rulemaking, we reverse and remand.

## I. BACKGROUND

Tunik was an Administrative Law Judge ("ALJ") with the Social Security Administration ("Agency"). During the course of his employment, Tunik issued an opinion remanding a disability claim to a state agency due to asserted deficiencies in the state agency's consideration of the claim. Subsequently, Tunik informed Acting Regional Chief Administrative Law Judge Mary Bisantz ("Bisantz") of his disposition of the case and his similar disposition of other cases. The state agency refused to comply with the remand order and sent the case back to the Agency. Several months after being informed of Tunik's actions, Bisantz reviewed Tunik's decision and issued a memorandum to Acting Spokane Hearing Office Chief Administrative Law Judge Mary

Reed ("Reed") asserting that Tunik had improperly dismissed the case. The memorandum also instructed Reed to inform Tunik that his decision was invalid and to offer him the opportunity to rectify his alleged mistake by vacating the dismissal order and hearing the case on its merits. Bisantz also sent a memorandum to Tunik informing him that his decision in the case was without legal justification and could result in disciplinary action.

Tunik sent a memorandum to the Agency's Chief Administrative Law Judge protesting Bisantz's actions. Nevertheless, Tunik vacated his original order remanding the case to the state agency. In his consideration of the case on the merits, Tunik drafted a new decision holding that the claimant had been denied due process of law by the lack of a proper decision by the state agency. Reed reviewed the decision prior to its issuance and notified Bisantz of its contents. Bisantz instructed Reed to prevent the decision from issuing and to transfer the case file to Bisantz. Bisantz ultimately allowed the decision to issue with a minor non-substantive change.

During the course of the above events, Tunik remanded a second case to the state agency on the same grounds as the first remand. Bisantz issued a second memorandum to Tunik informing him of the state agency's protest of this second decision. Reed again informed Tunik that he should vacate his order, or the case would be reassigned. Tunik vacated his remand order in the second case and took the case up on the merits.

A few weeks after vacating his remand order in the second case, Tunik filed a complaint with the Board alleging that Bisantz's and Reed's actions had interfered with his decisional independence. Tunik filed a motion for summary judgment, which the

03-3286, -3330, -3331                3

ALJ granted on December 14, 2000. Both sides filed petitions for review before the Board. Before the Board rendered its decision, Tunik voluntarily retired effective May 31, 2003. Nevertheless, on June 27, 2003, the Board reversed the initial decision and dismissed the appeal for lack of jurisdiction. Tunik v. Social Sec. Admin., 93 M.S.P.R. 482 (2003). In doing so, the Board overruled its prior decision in In re Doyle, 29 M.S.P.R. 170 (1985), which had recognized an action for "constructive" removal before the Board under 5 U.S.C. § 7521, even though the claimant had not been actually separated from his or her position. 93 M.S.P.R. at 488-92. The Board based its reconsideration on our decision in Butler v. Social Security Administration, 331 F.3d 1368 (Fed. Cir. 2003), and on the perceived lack of support for such a construction of section 7521 even at the time Doyle was decided. Tunik timely filed a petition for review with this court.

Dethloff and numerous other ALJs with the Agency challenged various Agency practices that allegedly interfered with the requirement in 5 U.S.C. § 3105 that case assignments to ALJs occur in rotational order. Dethloff himself was taken out of the assignment rotation for recommended on-the-record cases. On June 21, 2002, the Board's ALJ issued an Interim Decision dismissing most of the claims for lack of jurisdiction because the ALJs had failed to allege facts showing that the failure to assign cases on a rotational basis caused their constructive removal. Dethloff v. Social Sec. Admin., No. CB-7521-02-0008-T-1 (M.S.P.B. June 21, 2002) (interim decision). Subsequently, on August 7, 2002, the ALJ issued a First Initial Decision denying reconsideration of the Interim Decision and granting entry of a settlement agreement with respect to the remaining claims. Dethloff v. Social Sec. Admin., No. CB-7521-02-

0008-T-1 (M.S.P.B. Aug. 7, 2002) (first initial decision). However, on July 31, 2003, on the ALJs' petition for review, the Board re-opened the case sua sponte and issued a new opinion citing Tunik and holding that the ALJs had not alleged that they were actually separated from their positions. Dethloff v. Social Sec. Admin., 93 M.S.P.R. 574 (2003). Thus, the Board dismissed the appeals for lack of jurisdiction. Id. at 577. Dethloff and the other ALJs timely petitioned for review with this court.

Schloss is also an ALJ with the Agency. Schloss was assigned to decide a claim for disability benefits. The claimant's representative sent two letters to Schloss seeking a favorable on-the-record decision on the claim. However, the letters were delayed in being transmitted to Schloss. After each letter was sent to Schloss, the claimant's representative sent a letter to Hearing Office Chief Administrative Law Judge Riley Atkins ("Atkins"), Schloss's supervisor. The two letters alleged that Schloss was imposing an improper legal standard related to a request for an on-the-record decision. Schloss ultimately denied the request for an on-the-record decision.

After reviewing Schloss's decision, Atkins reassigned the case to another ALJ. Schloss filed a complaint with the Board. The presiding judge held that the Agency had interfered with Schloss's qualified decisional independence in reassigning the case. However, on July 28, 2003, the Board reversed the presiding judge's Initial Decision and, citing Tunik, held that the Board had no jurisdiction over the case. Schloss v. Social Sec. Admin., 93 M.S.P.R. 578 (2003). Schloss timely petitioned for review with this court.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

### A. Standard of Review

This court must affirm the Board's decision unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (2000). Whether the Board has jurisdiction to hear an appeal is a question of law reviewed <u>de novo</u>. <u>Diefenderfer v. Merit Sys. Prot. Bd.</u>, 194 F.3d 1275, 1277 (Fed. Cir. 1999). The Board's jurisdiction is limited to those actions specifically granted by law, rule, or regulation. 5 U.S.C. § 7701(a) (2000); <u>Meeker v. Merit Sys. Prot. Bd.</u>, 319 F.3d 1368, 1374 (Fed. Cir. 2003).

### B. Analysis

#### 1. Tunik's Appeal

As a preliminary matter, the Agency, as Intervenor, argues that Tunik's appeal is moot because he voluntarily retired. Tunik responds that his claim for attorney's fees remains alive and that he may choose to claim on remand that his retirement was involuntary. Moreover, he argues that there remains a risk that the Agency would take similar actions to impair his decisional independence in the future. First, we are unable to discern the claim for attorney's fees to which Tunik refers. He has presented no claim for attorney's fees to this court, nor did he present a claim for attorney's fees to the Board. Moreover, even if he had presented a claim for attorney's fees, "[an] interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." <u>Lewis v. Continental Bank Corp.</u>, 494 U.S. 472, 480 (1990). Second, although Tunik is free to assert a claim that

his retirement was in fact involuntary, he has not done so before this court, nor has he done so before the Board. Thus, any claim for involuntary retirement is not a part of this case and is not before us. Tunik's complaint only seeks prospective relief to prevent his supervisors from interfering with his decisional independence. Given that Tunik has retired, it is difficult to see how any of Tunik's supervisors could interfere with his decisional independence in the future. Thus, Tunik's appeal is moot and must be dismissed. County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) ("[J]urisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." (citation omitted)); United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

The fact that Tunik's appeal is moot is not changed by 5 U.S.C. § 7701(j). That statute states:

> In determining the appealability under this section of any case involving a removal from the service (other than the removal of a reemployed annuitant), neither an individual's status under any retirement system established by or under Federal statute nor any election made by such individual under any such system may be taken into account.

5 U.S.C. § 7701(j) (2000). In Mays v. Department of Transportation, 27 F.3d 1577, 1579 (Fed. Cir. 1994), we held that "[t]he plain language of section 7701(j) means that retirement status cannot be taken into account in determining the appealability of 'any case involving a removal.'" That case involved an employee of the Department of Transportation that retired on the effective date of her removal. We held that her

retirement did not render her appeal moot under the statute. Id. However, Mays involved an involuntary retirement. Id. at 1580 ("[T]he agency does not dispute that Mays would not have retired when she did if it had not been for the removal action."); see also Heelen v. Dep't of Commerce, 154 F.3d 1306, 1309 n.1 (Fed. Cir. 1998) (applying section 7701(j) again in the context of an involuntary retirement). If Mays prevailed in her action, presumably she would have been entitled to some relief, even though she retired in the interim. Here, however, even if Tunik prevails, it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Concentrated Phosphate, 393 U.S. at 203. Even if the statute extended to the situation before us, it could not confer authority on this court to hear a case where that authority is constitutionally lacking. See Sec. & Exch. Comm'n v. Med. Comm. for Human Rights, 404 U.S. 403, 407 (1972) ("Our lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." (quotation marks and citation omitted)).

The fact that Tunik retired prior to the Board's decision in this case raises an additional issue. Although the Board is a creature of statute and is not necessarily subject to the requirements of Article III of the Constitution, Congress has nonetheless provided that "[t]he Board shall not issue advisory opinions." 5 U.S.C. § 1204(h) (2000). Given that Tunik's appeal was moot when the Board issued its decision in this case, the Board's opinion was advisory and must be vacated. Because the remaining appeals relied on and thus implicate the rationale of the Board's decision in Tunik's case, we will address that rationale to the extent it relates to the other appeals before us.

## 2. Constructive Removal

Because of the number of executive agencies within the Federal Government that both set policy and adjudicate private rights, and the need for the orderly administration of claims relating thereto, Congress enacted the Administrative Procedure Act ("APA"). See H.R. Rep. No. 79-1980, at 7-8 (1946); 28 Cong. Rec. 2149 (1946) (statement of Sen. McCarran). A substantial driving force behind the enactment of the APA was the need for greater independence of those adjudicating private rights:

> Furthermore, the same men are obliged to serve both as prosecutors and as judges. This not only undermines judicial fairness; it weakens public confidence in that fairness. Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings which the Commission, in the role of prosecutor, presented to itself.

S. Rep. No. 79-752, at 3 (1945) (quoting Administrative Management in the Government of the United States: Report of the President's Committee 40 (1937)); see also Ramspeck v. Fed. Trial Exam'rs Conference, 345 U.S. 128, 131-32 (1953); Final Report of the Attorney General's Committee on Administrative Procedure 203-09 (William S. Hein & Co. 1997) (1941) (discussing the problem of mixing legislative, prosecutorial, and judicial functions in a single agency and proposed solutions).

To address this concern, the APA, as originally passed in 1946, provided that agency hearings subject to the APA had to be presided over by the agency, one or more members of the body comprising the agency, or one or more examiners as provided in the APA. Administrative Procedure Act, Pub. L. No. 79-404, § 7(a), 60 Stat. 237, 241 (1946) (current version at 5 U.S.C. § 556 (2000)). In an effort to maintain a level of independence for the examiners, the APA provided for employment of examiners by each agency subject to certain restrictions. Id. § 11, 60 Stat. at 244.

Section 11 of the APA stated, "Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission . . . after opportunity for hearing and upon the record thereof." Id.

The Civil Service Reform Act of 1978 created the Merit Systems Protection Board and placed it in the role of the Civil Service Commission as the body with authority to decide whether an ALJ could properly be disciplined by an employing agency. Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121-31. The Civil Service Reform Act also revised section 7521 and placed it substantially in its current form. Id. § 204, 92 Stat. at 1137. The current version states:

> (a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.
> (b) The actions covered by this section are—
>     (1) a removal;
>     (2) a suspension;
>     (3) a reduction in grade;
>     (4) a reduction in pay; and
>     (5) a furlough of 30 days or less . . . .

5 U.S.C. § 7521 (2000).

In In re Doyle, 29 M.S.P.R. 170 (1985), the Board interpreted an earlier but substantively similar version of section 7521 to protect ALJs from more than actual separation from employment. In interpreting "removal" under the statute, the Board concluded that an ALJ could bring a claim for removal under section 7521 even though the offending conduct was less than physical separation from federal employment. The Board based its decision on the history and remedial purpose of the APA. 29 M.S.P.R. at 174-75. The Board held that "'removal' has consistently been interpreted as protecting an administrative law judge from actions of his employing agency that could

impair his qualified judicial independence." Id. at 174. The Board subsequently codified the holding of Doyle pursuant to notice and comment rulemaking at 5 C.F.R. § 1201.142. Merit Systems Protection Board Practices and Procedures, 62 Fed. Reg. 48449, 48455 (Sept. 16, 1997) (interim rule, request for comments); Merit Systems Protection Board Practices and Procedures, 63 Fed. Reg. 42685 (Aug. 11, 1998) (final rule).

The Board applied this standard in two subsequent cases that were appealed to this court. First, in Sannier v. Merit Systems Protection Board, 931 F.2d 856 (Fed. Cir. 1991), a group of ALJs from the Social Security Administration challenged various management practices allegedly intended to promote productivity at the Lansing, Michigan Office of Hearings and Appeals. Because the practices complained of involved, inter alia, refusing to replace ALJs at the particular office until productivity increased and asking ALJs to transfer out of that office so it could be closed, we held that the Board properly determined that it did not have jurisdiction over the action. In reaching this decision, we quoted the Board's standard set forth in Doyle. Agreeing with the Board's standard, we said, "Well-pleaded allegations tying the agency actions to impairment of their decisionmaking independence are, at minimum, necessary to establish prima facie Board jurisdiction." Id. at 858. Further, in rejecting the ALJs' claim that they had pled sufficient facts to warrant Board jurisdiction whether or not they would ultimately prevail, this court applied the Doyle standard. We said that even "assum[ing] arguendo that the agency explicitly instituted overall targets or goals for the number of appeals to be adjudicated per month, such production targets simply are not, by

themselves, probative that the ALJ's impartiality or independence in a particular appeal has been or would be compromised." Id. at 859.

In Stephens v. Merit Systems Protection Board, 986 F.2d 493 (Fed. Cir. 1993), Stephens argued that the Department of Health and Human Services' requirement that Stephens attend a specially designed course of instruction resulted in a constructive removal under section 7521. We again affirmed the Board's dismissal of this claim for lack of jurisdiction. In reaching that conclusion, we noted that section 7521 was "specifically limited to removals, suspensions, reductions in grade, reductions in pay and furloughs of 30 days or less." Id. at 496. Nevertheless, citing Sannier, we said that "[t]his court has determined . . . that constructive removals are also covered by that section." Id. In setting forth the standard, we quoted Sannier's quotation of Doyle recognizing a constructive removal where an agency's actions interfere with an ALJ's qualified independence. Id. As in Sannier, the court in Stephens rejected Stephens's argument that he was entitled to a hearing on jurisdiction because "even accepting all of petitioner's factual allegations as true, the Board still does not have jurisdiction because the program and instructional course do not impair petitioner's decisional independence." Id. at 497.

The petitioners argue that the Board erred in holding that it does not have jurisdiction to hear a claim for constructive removal under section 7521 by a person not actually separated from the position of ALJ because that holding is inconsistent with the decisions of this court in Sannier and Stephens. In particular, the petitioners assert that the Board is not free to reject or overrule this court's interpretation of section 7521 applied in both Sannier and Stephens. The Board raises two arguments in response.

First, the Board argues that because both Sannier and Stephens affirmed the Board's holdings that it lacked jurisdiction, the Board's later adoption of an additional requirement for jurisdiction—actual separation from employment as an ALJ—does not conflict with those decisions. Second, the Board argues that our review in both Sannier and Stephens was deferential in nature and was not a de novo interpretation of section 7521. According to the Board, this court was merely holding that the Board's interpretation was a reasonable one, applying Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Thus, the Board contends it is free to reconsider its interpretation of the statute.[1]

We first address the Board's argument that its adoption of an additional requirement does not conflict with our prior decisions in Sannier and Stephens. The Board, citing Watson v. Department of the Navy, 262 F.3d 1292 (Fed. Cir. 2001), argues that our holdings in Sannier and Stephens merely recognized that the facts of those cases did not constitute removal under section 7521. According to the Board, its

---

[1]    In reaching its decision in Tunik, the Board viewed our decision in Butler v. Social Security Administration, 331 F.3d 1368 (Fed. Cir. 2003), as requiring that "removal" in section 7521 have exactly the same meaning as "removal" in 5 U.S.C. § 7512, the parallel provision governing removal of federal employees. Tunik, 93 M.S.P.R. at 486-87. The Agency as intervenor makes a similar argument before this court. Butler concerned the Board's jurisdiction over an appeal from an agency's elimination of administrative duties associated with the position of Hearing Office Chief ALJ. 331 F.3d at 1370-71. This court held that the action did not fall under section 7521 because "the action taken by the [Social Security Administration] in divesting the petitioner of his Hearing Office Chief duties did not reduce the petitioner's grade or pay." Id. at 1372. The action also was held not to be a "removal" as defined in a regulation, 5 C.F.R. § 930.214(a) (2003), which covers "reassignment" or "demotion" "to a position other than that of an administrative law judge." Id. at 1373. While a claim for constructive removal was raised before the Board by the petitioner in Butler, the petitioner "did not properly raise this issue on appeal." 331 F.3d at 1371 n.2. Butler did not construe section 7521 as it pertains to constructive removals.

holding that a removal requires actual separation from employment was not in conflict with those decisions.

Watson does not support the Board's argument. Watson involved a determination as to whether certain personnel met the statutory and regulatory criteria for early retirement coverage as law enforcement officers. 262 F.3d at 1295. In considering the petitioners' claims, the Merit Systems Protection Board "employed a new approach that more affirmatively considered the reasons for the creation and existence of the positions than it had used in its prior LEO decisions." Id. The petitioners argued that the new approach was inconsistent with the factors employed in this court's prior decision in Bingaman v. Department of the Treasury, 127 F.3d 1431 (Fed. Cir. 1997). In rejecting that contention, we said:

> In examining the duties performed by these petitioners, the Bingaman court only addressed prongs (ii) and (iii) of 5 C.F.R. §§ 831.902, 842.802. The court did not need to consider prong (i) of the test—examining the basic reasons for the existence of the position—because the court found that the petitioners had failed to meet their burden of proof regarding the second and third prongs of 5 C.F.R. §§ 831.902, 842.802.

Watson, 262 F.3d at 1301-02 (citation omitted). Thus, there was nothing in the Board's Watson decision that was inconsistent with this court's analysis in Bingaman.

Moreover, the Board's argument implies that the statement of the standard applied in the Sannier and Stephens cases is dictum and need not be followed. The Supreme Court, however, has rejected such a proposition. In Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), the Supreme Court considered whether to adhere to the rationale expressed in a line of cases that admittedly did not involve the precise factual issue presented in the pending case. In applying the rationale of that line of cases, the Court said,

> We adhere in this case, however, not to mere obiter dicta, but rather to the well-established rationale upon which the Court based the results of its earlier decisions. When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.

Id. at 66-67.

Our decisions in Sannier and Stephens adopted and applied the Board's Doyle standard. In Sannier, we said that removal under section 7521 encompasses cumulative administrative action or active intervention that prevents the impartial exercise of judicial function and that has a pernicious effect on qualified judicial independence. 931 F.2d at 858 (quoting Doyle, 29 M.S.P.R. at 175). We affirmed the Board's application of the Doyle rationale in rejecting the ALJs' assertions that personnel policies designed to increase productivity constituted constructive removal, concluding that such policies did not interfere with an ALJ's independence or impartiality. Id. at 858-59. Subsequently, in Stephens, we again employed the standard expressed in Sannier to reject Stephens's assertion that a mandatory course of instruction amounted to constructive removal. We stated specifically, in referring to Sannier, "This court has determined, however, that constructive removals are also covered by that section." 986 F.2d at 496. The Board is not free to reject the rationale employed in reaching those decisions as dictum.

In its opinion in Tunik, the Board concluded that this court in Sannier merely "recognized" the Doyle theory of jurisdiction. Tunik, 93 M.S.P.R. at 491. The Board said that this court "did not create the concept or necessarily endorse it." Id. Such a position is difficult to reconcile with the language of Sannier and is impossible to reconcile with Stephens, which the Board did not even mention. This court both found the Board's interpretation of section 7521 in Doyle to be reasonable and affirmed the

03-3286, -3330, -3331                    15

Board's application of the standard derived from its interpretation in deciding the Sannier and Stephens cases.

We next address the Board's contention that it was free to reconsider its earlier decision in Doyle, notwithstanding our decisions in Sannier and Stephens. This entails our consideration of the deference due the Board's interpretation of section 7521 and the extent to which any such deference was employed in our decisions in Sannier and Stephens. As to the former, the parties dispute whether the Board is entitled to any deference in its interpretation of section 7521. The Board, citing 5 U.S.C. § 1305, argues that it is charged with administering section 7521 and that its interpretation is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In United States v. Mead Corp., the Supreme Court "recognized a very good indicator of delegation meriting Chevron treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." 533 U.S. 218, 229 (2001). Section 1305 provides exactly that for the Board regarding section 7521. Section 1305 states that "for the purpose of section 7521 of this title, the Merit Systems Protection Board may investigate, prescribe regulations, appoint advisory committees as necessary, recommend legislation, subpena [sic] witnesses and records, and pay witness fees as established for the courts of the United States." 5 U.S.C. § 1305 (2000). Further, section 7521 authorizes the Board to adjudicate whether an agency has established good cause for disciplinary action against an ALJ. Id. § 7521 ("An action may be taken against an administrative law judge . . . only for good cause established and determined by the Merit Systems Protection Board on the record after

opportunity for hearing before the Board."). Both <u>Sannier</u> and <u>Stephens</u> involved such adjudications. The Board has been charged with administering section 7521 through both rulemaking and adjudication and is entitled to <u>Chevron</u> deference in these activities.

In <u>Chevron</u>, the Supreme Court established a two-part test for evaluating an agency interpretation of a statute. First, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. Thus, in determining the extent of deference given to the Board in <u>Sannier</u> and <u>Stephens</u>, the inquiry boils down to which portion of the <u>Chevron</u> analysis was applied.

Although not expressly framed under either prong of <u>Chevron</u>, the analysis in <u>Sannier</u> falls into the latter category. The analysis in <u>Sannier</u> begins by quoting section 7521 but acknowledges, "Petitioners do not, and cannot, contend under these facts that they were subjected to any of the enumerated adverse personnel actions listed in subsection (b)." 931 F.2d at 858. After observing that the petitioners based their claim solely on "constructive" removal, the court said, "Although a 'constructive' removal is not specifically enumerated in subsection (b), the Board, as well as this court, has recognized that certain acts may be the equivalent, for purposes of Board jurisdiction, of formal removal." <u>Id.</u> This court's initial observation that the petitioners' claim ventured outside the literal language of the statute is an express acknowledgement that

Congress has not unambiguously expressed its intent on the issue of constructive removal. Where the statute is silent or ambiguous with respect to a particular issue, this court must consider whether the agency's interpretation is permissible. Chevron, 467 U.S. at 843.

The analysis in Sannier continues by stating that "the Board recognizes the possibility that an ALJ may be constructively removed by 'cumulative administrative actions or active intervention . . . [which] prevent the impartial exercise of his judicial functions . . . [and which have] a pernicious effect on the complaining judge's qualified independence.'" Sannier, 931 F.2d at 858 (quoting Doyle, 29 M.S.P.R. at 175) (alterations in original). This court then said,

> We agree with the Board that "even if [it] were to assume that the ALJs have suffered, among other things, staffing shortages, transfer restrictions and reduced service areas due to management's perception that the Lansing ALJs production rate was low, they have not alleged in any of the many papers submitted that these actions of management have interfered with their impartial decisionmaking ability."

Id. (quoting In re Sannier, 45 M.S.P.R. 420, 426 (1990)) (alteration in original). It is difficult to view the analysis in Sannier as anything other than deferential to the Board's interpretation of section 7521 as a permissible gap-filling in a specific area to which the statute fails to speak. See Chevron, 467 U.S. at 843-44 (noting that Congress may implicitly delegate authority to an agency to fill in gaps where there is not an explicit gap in the statute).

Because the Board's interpretation of section 7521 was reasonable, the Board's interpretation as set forth in Doyle and reiterated in Sannier was properly the law. See Mead Corp., 533 U.S. at 229 (noting that it may be apparent that Congress conferred authority on an agency to speak with the force of law even over issues about which

Congress had no intent). When this court again considered the Board's application of section 7521, we applied the Board's constructive removal standard as the governing law. In Stephens, the court again noted that section 7521 is "specifically limited to removals, suspensions, reductions in grade, reductions in pay and furloughs of 30 days or less." 986 F.2d at 496. Citing Sannier, we said that "[t]his court has determined, however, that constructive removals are also covered by that section." Id. Thus, this court again acknowledged that constructive removal was outside the clear language of the statute and, by implication, the clear intent of Congress. Although it is possible to read that statement in Stephens as concluding that section 7521 expressly covers constructive removal—i.e., that Congress's intent on this point is clear—as discussed supra, Sannier held that the statute was silent on this point. Even Stephens acknowledged that the constructive removal doctrine exceeds the plain language of the statute. The better reading of Stephens, then, is that it was merely acknowledging that Sannier's determination that the Board's interpretation was permissible was sufficient to make the Board's interpretation the governing law. Thus, Stephens also indicates that this court applied the second prong of Chevron to the Board's interpretation of section 7521.

The conclusion that Sannier and Stephens reflect appropriate deference to the Board brings us to the question of whether the Board is free to reconsider its interpretation of section 7521, despite Sannier and Stephens. The Board relies on Bankers Trust New York Corp. v. United States, 225 F.3d 1368, 1376 (Fed. Cir. 2000). In Bankers Trust, this court concluded that the Court of Federal Claims erred in holding that an Internal Revenue Service regulation trumped a prior conflicting decision of the

Court of Claims. Id. at 1376. In holding that the agency was not free to overturn the decision of its reviewing court by regulation, we distinguished the Ninth Circuit's decision in Mesa Verde Construction Co. v. Northern California District Council of Laborers, 861 F.2d 1124 (9th Cir. 1988) (en banc). In Mesa Verde, the Ninth Circuit held that where a prior panel of the court had applied an agency's interpretation of a statute after concluding that the agency's interpretation was reasonable, a later panel of the court was free to accord deference to a new agency interpretation without en banc review, even if it conflicted with the interpretation applied in the earlier panel decision. Id. at 1134-36. In Bankers Trust, we said, "This is not a case like Mesa Verde, in which the original decision was itself based on deference to the agency; under such circumstances, we might well consider the agency's change of heart as a significant factor." 225 F.3d at 1376. Because we have concluded that Sannier and Stephens were based on deference to the Board's interpretation of section 7521, this court must now confront directly the question presented in Mesa Verde.

We agree with Mesa Verde that where an earlier panel decision on statutory construction was based on deference to an agency interpretation, a later panel of this court is free to consider whether a new agency interpretation is reasonable without en banc reconsideration of the earlier panel decision. In this circuit, like the Ninth Circuit, panels of the court are bound by prior panel decisions. Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988). Although that rule could be construed to preclude giving deference to a new agency interpretation even where our prior decision was based on deference, we think that the better view is that a panel should be free to consider whether the new interpretation is permissible in keeping with our role as a

reviewing court under the Chevron framework. See Chevron, 467 U.S. at 863-64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."). Quoting Chevron, in Rust v. Sullivan, the Supreme Court said, "This Court has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." 500 U.S. 173, 186 (1991) (quoting Chevron, 467 U.S. at 862). Where an agency's new interpretation is entitled to deference, a reviewing court should not substitute its judgment for that of the agency unless the agency's judgment is unreasonable. Chevron, 467 U.S. at 843-44 (stating that where Congress has left a gap in a statutory scheme, even implicitly, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). Thus, we think the better view, as the Ninth Circuit held in Mesa Verde, is that a later panel of this court must be free to consider whether an agency's new interpretation of a statute that it is charged with administering is reasonable without being bound by a deferential interpretation applied in a prior panel decision.

We also agree with the Board that Watson provides some support for this rule in that this court noted in Watson that its prior decision in Bingaman was deferential. However, as noted supra, the question was not squarely presented in Watson because the standard employed in Watson was entirely consistent with the rationale of Bingaman. Watson, 262 F.3d at 1301-02. Thus, we conclude that the Board was not

bound to interpret section 7521 in the same manner it was interpreted in <u>Sannier</u> and <u>Stephens</u>.

This leads us next to the question of whether the Board's new interpretation of section 7521 is permissible. <u>Chevron</u>, 467 U.S. at 843; <u>Mesa Verde</u>, 861 F.2d at 1130-31. The Board justified its new interpretation on multiple grounds. Some of the Board's proffered justifications for adopting its new standard have been rejected <u>supra</u>, and there is no need to repeat them here. Because we conclude that the Board's interpretation of the plain language of section 7521 is reasonable based on the policy arguments it has advanced, we will focus on those arguments. The Board, in its <u>Tunik</u> decision, stated that

> if constructive removal means what the Board interpreted it to mean in <u>Doyle</u>, then an agency would have to first seek the Board's permission, with the opportunity for a full evidentiary hearing, every time it wants to take actions like the ones at issue here, which involve such things as case processing matters and training requirements.
>
> . . . We cannot believe that this sort of micromanagement, and the likely slowdown in the agency's work that it would cause, is what Congress intended when it used the word "removal" in 5 U.S.C. § 7521. Instead, the plain language of the statute shows that Congress intended to protect individuals from losing their positions as ALJs by requiring agencies to obtain the Board's permission before separating persons from ALJ positions. This gives ALJs greater protection than employees covered under section 7512 because an appeal from a section 7512 action may be brought only <u>after</u> the action has been taken. The additional protection afforded by section 7521 sufficiently safeguards the qualified judicial independence of an ALJ.

<u>Tunik</u>, 93 M.S.P.R. at 492.

We agree with the Board that the plain language of section 7521 reasonably can be read to apply only to cases of actual separation from employment as an ALJ. As noted <u>supra</u>, both <u>Sannier</u> and <u>Stephens</u> recognized that the constructive removal doctrine went beyond the plain language of the statute. If anything, the more natural

03-3286, -3330, -3331                    22

reading of section 7521 would preclude the constructive removal doctrine entirely. The Board's earlier contrary opinion in Doyle relied in part on the Court of Claims' decision in Benton v. United States, 488 F.2d 1017 (Ct. Cl. 1973). Doyle, 29 M.S.P.R. at 174-75. In Benton, the Court of Claims held that subjecting a hearing examiner to involuntary retirement under the Civil Service Retirement Act constituted removal under section 11 of the APA. In its analysis, the court said, "We reach our conclusion in recognition of the fact that the APA was a sweeping piece of remedial legislation which was a long time in coming. For that reason, we think it should be given a broad and generous interpretation in light of the objectives sought to be accomplished." 488 F.2d at 1022. Benton, however, recognized that "removal" relates to an actual separation from employment and merely extended such removals to circumstances in which the reason for such separation was not disciplinary in nature. Id. at 1020-21. Similarly, this court's decision in Sannier cited Schultz v. United States Navy, 810 F.2d 1133 (Fed. Cir. 1987), as supporting a broad understanding of removal. However, Schultz held only that a voluntary resignation based on agency coercion constituted an adverse action. Id. at 1137. Thus, no decision of this court has construed section 7521 to cover anything other than actual separation from employment as an ALJ, except in the deferential context of Sannier and Stephens.

The ALJs argue that the APA was designed to secure decisional independence of administrative judges. Similarly, the ALJs argue that the legislative history of the APA indicates the importance of decisional independence to Congress. Although the ALJs are correct that the APA was concerned with effecting independence for ALJs, neither the APA itself nor the legislative history behind it indicates that Congress intended to

extend section 7521 to cover anything less than actual separation from employment as an ALJ. There were some who expressed such views. However, the history of the APA does not show that those views reflected the intent of Congress in enacting the APA. See Ramspeck v. Fed. Trial Exam'rs Conference, 345 U.S. 128, 131-33 (1953) ("The position of hearing examiners is not a constitutionally protected position. It is a creature of congressional enactment. . . . They hold their posts by such tenure as Congress sees fit to give them."); see also S. Rep. No. 79-752, at 30 (1945) ("On those subjects, such as the separation of examiners from the agencies they serve, there has been a wide divergence of views. The committee has in such cases taken the course which it believes will suffice without being excessive."). We cannot agree with the ALJs that the term "removal" in section 7521 must be construed to encompass constructive removal.

The ALJs additionally argue that in view of 5 U.S.C. § 3105, section 7521 must be construed broadly to include constructive removal. Section 3105 provides that "[a]dministrative law judges . . . may not perform duties inconsistent with their duties and responsibilities as administrative law judges." 5 U.S.C. § 3105 (2000). Based on section 3105, the ALJs argue that "removal" in section 7521 must include anything that causes ALJs to perform duties that are inconsistent with their duties and responsibilities as ALJs. In particular, the ALJs argue that interference with their decisional independence causes them to perform their duties in an unfair manner, which is inconsistent with their duties as ALJs. It is unclear, however, how an agency's interference with an ALJ's decisional independence causes an ALJ to perform a duty that is inconsistent with the ALJ's duties and responsibilities as an ALJ. The ALJs are not arguing that they are being required to perform duties other than the adjudication of

cases. Instead, they are complaining about the manner of performance of that duty. Section 3105 does not speak to this issue. Even if the ALJs were correct, there is no plausible reason to engraft such a contorted interpretation of section 3105 onto section 7521. We thus conclude that the Board's interpretation of section 7521 to require actual physical separation from employment as an ALJ is not unreasonable.

The remaining arguments of the ALJs have been considered but are not persuasive. We thus conclude that the Board's new interpretation of section 7521 is reasonable and that our decisions in Sannier and Stephens do not preclude the Board from adopting such a new interpretation.

### 3. Overturning the Regulation

Our holding that the Board's new interpretation of section 7521 is permissible does not end the inquiry. The Board has promulgated a regulation, 5 C.F.R. § 1201.142, codifying the holding of Doyle. The regulation states, "An administrative law judge who alleges that an agency has interfered with the judge's qualified decisional independence so as to constitute an unauthorized action under 5 U.S.C. 7521 may file a complaint with the Board under this subpart." 5 C.F.R. § 1201.142 (2004). The Board recognized the inconsistency between the extant regulation and its desire to overrule Doyle. In dealing with the regulation, the Board said:

> The Board's regulation at 5 C.F.R. § 1201.142 conforms to the Doyle theory of jurisdiction. That regulation states that an ALJ may file a complaint with the Board if he alleges that "an agency has interfered with [his] qualified decisional independence so as to constitute an unauthorized action under 5 U.S.C. § 7521." The fact that a regulation is based on an erroneous interpretation of a statute does not prevent us from overruling the case law on which the regulation is based. Rather, the statute takes precedence over the regulation. We therefore will overrule Doyle and change our regulations later to conform to the statute and the new precedent.

<u>Tunik v. Social Sec. Admin.</u>, 93 M.S.P.R. 482, 492 (2003) (citation omitted and alteration in original). Because the Board overturned its regulation through adjudication, we asked for additional briefing as to whether the holding of <u>American Federation of Government Employees, AFL-CIO, Local 3090 v. Federal Labor Relations Authority</u>, 777 F.2d 751, 758-60 (D.C. Cir. 1985), might preclude the Board's decision in this case. The ALJs, the government, and the Social Security Administration submitted supplemental briefs on this issue.

We conclude that the Board misunderstood its role as an administrative agency and failed to consider the question of whether and under what circumstances the Board, by adjudication, could overturn its regulation. If the Board's regulation is subject to the requirements of 5 U.S.C. § 553, requiring notice and comment rulemaking, the Board's regulation is the governing law and may not be overturned by the Board outside the procedural requirements of section 553. <u>United States v. Nixon</u>, 418 U.S. 683, 695-96 (1974) ("So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it."). To determine whether the Board improperly overruled its regulation, we must determine whether the regulation is subject to section 553.

Section 553(b) requires notice of proposed "rule making" to be published in the Federal Register. 5 U.S.C. § 553(b) (2000). Section 553(c) requires the agency attempting to promulgate the relevant rule to allow interested persons to participate in the process by providing comments on the proposed rules. <u>Id.</u> § 553(c). Section 551(5) expressly defines "rule making" as the "agency process for formulating, amending, or

repeating a rule." Id. § 551(5) (emphasis added). Thus, to the extent that promulgation of 5 C.F.R. § 1201.142 was subject to the requirements of section 553, the repeal of that regulation is also subject to section 553.

Section 553 has numerous exceptions, however, two of which are relevant here. First, section 553(a)(2) excludes "a matter relating to agency management or personnel." Second, section 553(b)(A) excludes "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" from the requirements of section 553. If either of these exceptions applies, the Board's rule is not subject to section 553, and the Board is free to repeal that rule without engaging in formal rulemaking as prescribed by section 553. On the other hand, if neither exception applies, then the Board's rulemaking was governed by section 553 and was subject to the requirements of notice and comment.

The first exception excludes matters relating to agency management or personnel. That provision was in the original APA in essentially the same terms as appear today. Administrative Procedure Act, Pub. L. No. 79-404, § 4, 60 Stat. 237, 238 (1946) ("Except to the extent that there is involved . . . (2) any matter relating to agency management or personnel . . . ."). Although the legislative history of this provision is sparse, the Attorney General provided a contemporaneous interpretation of the provision in the Attorney General's Manual on the Administrative Procedure Act published in 1947. Because of the extensive involvement of the Attorney General in the drafting and enactment of the APA, the Attorney General's contemporaneous interpretation of the provision is entitled to some weight. Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979) ("In prior cases, we have given some weight to the Attorney

General's Manual on the Administrative Procedure Act (1947), since the Justice Department was heavily involved in the legislative process that resulted in the Act's enactment in 1946."). Regarding the agency management or personnel exception, the Attorney General said, "The exemption for matters relating to 'agency management or personnel' is self-explanatory and has been considered in the discussion of 'internal management' under section 3." Attorney General's Manual on the Administrative Procedure Act 27 (1947) ("Attorney General's Manual"). The exemption in section 3 of the APA was for "any matter relating solely to the internal management of an agency." Administrative Procedure Act, Pub. L. No. 79-404, § 3, 60 Stat. 237, 238 (1946). With respect to that exemption, the Attorney General said,

> If a matter is solely the concern of the agency proper, and therefore does not affect the members of the public to any extent, there is no requirement for publication under section 3. Thus, an agency's internal personnel and budget procedures need not be published (e.g., rules as to leaves of absence, vacation, travel, etc.). However, in case of doubt as to whether a matter is or is not one of internal management, it is suggested that the matter be published in the Federal Register, assuming it does not require secrecy in the public interest.

Attorney General's Manual 18. Although the provision in section 3 is worded differently from section 4, the Attorney General was of the opinion that the agency management or personnel exception was essentially of the same scope. The Senate Report seemed to take a similar view stating, "The exception of matters of management or personnel would operate only so far as not inconsistent with other provisions of the bill relating to internal management or personnel." S. Rep. No. 79-752, at 13 (1945). Few courts have had the opportunity to interpret this provision.

In Seaboard World Airlines, Inc. v. Gronouski, 230 F. Supp. 44 (D.D.C. 1964), the plaintiff challenged a new postal regulation requiring mail to be sent by the most

expedient air service without regard to the type of aircraft used.  The new regulation significantly reduced the plaintiff's business in carrying mail for the U.S. Postal Service.  In replying to the plaintiff's argument that the rule was required to be promulgated in accordance with notice and comment rulemaking, the government argued that the regulation only provided directions to agency personnel as to how to ship mail and thus was within the agency management or personnel exception.  The district court disagreed, stating that "the policy involved here, although it is directed to the Post Office personnel, substantially affects outside parties and is therefore NOT subject to the exception."  Id. at 46.  The District of Columbia Circuit rejected a similar argument in Joseph v. United States Civil Service Commission, 554 F.2d 1140, 1153 n.23 (D.C. Cir. 1977).  In Joseph, the court considered the applicability of the agency management or personnel exception to a Civil Service Commission regulation exempting from the Hatch Act participation in political campaigns as, or on behalf of, an independent candidate in a partisan election for local office in the District of Columbia.  Relying on Seaboard, the court said, "Section 553(a)(2) must be narrowly construed, and although the Commission's regulation is only directed at government personnel it does not fall within section 553(a)(2) because outside individuals are substantially affected."  Id. (citation omitted).

The D.C. Circuit again considered the scope of the agency management or personnel exception in Stewart v. Smith, 673 F.2d 485 (D.C. Cir. 1982).  Stewart involved a challenge to the Bureau of Prisons' policy of not considering for employment any person who is over 34 years of age.  Id. at 487.  The D.C. Circuit held, over a vigorous dissent, that the hiring policy was not subject to section 553 because it fell

within the exception for agency management or personnel.  Id. at 496-500.  The majority read the exception in section 3 of the APA as being a narrower exception than the agency management or personnel exception in section 4 based on the plain language of the two provisions.  The dissent, on the other hand, read the two provisions as being co-extensive based on the legislative history and prior cases.  Id. at 502 (Wright, J., dissenting).

This court has twice considered the applicability of the agency management or personnel exception to section 553.  Favreau v. United States, 317 F.3d 1346, 1359 (Fed. Cir. 2002) (holding that memoranda detailing when the United States could seek recoupment of prepaid bonuses from armed forces personnel were subject to the agency management or personnel exception of section 553); Hamlet v. United States, 63 F.3d 1097, 1105 (Fed. Cir. 1995) (holding that the Agricultural Stabilization and Conservation Service personnel management handbook "relates to matters of agency personnel, [and thus] its promulgation was exempt from the strict procedural requirements found in the APA").  Because the facts in these two cases bear little resemblance to the facts of the case before us, we will focus on the more pertinent cases from the D.C. Circuit.

Although we need not decide whether the section 4 exception carries the same scope as the section 3 exception, we conclude that the exception in section 4 cannot be construed to exempt the regulation at issue from notice and comment rulemaking. Although removal of ALJs could be characterized in a sense as a personnel matter in the same manner as the hiring policy at issue in Stewart, the removal of ALJs goes to the heart of the APA and implicates a much broader class of the public than those who

might apply for employment with the Bureau of Prisons. Indeed, the removal of ALJs implicates not only the rights of an individual ALJ being removed, but also the broader interest of the public in having private rights adjudicated by persons who have some independence from the agency opposing them. In that sense, section 7521 is primarily for the public benefit and only secondarily for the benefit of a particular ALJ in a particular case. See Stewart, 673 F.2d at 505 (Wright, J., dissenting) ("In the narrow set of cases where a proposed rule substantially affects parties outside an agency and implicates broad public concerns, the personnel exemption from rulemaking requirements surely does not apply."). Thus, section 7521 is unlike the hiring policy at issue in Stewart, which was primarily for the internal benefit of the Bureau of Prisons, although secondarily impacting eligibility of applicants for employment. Indeed, a substantial justification for the APA, as noted supra, was the need for greater independence of those adjudicating private rights. Given the importance of the independence of ALJs to the framework of the APA, it would be unreasonable to conclude that regulations promulgated pursuant to section 7521, which is a cornerstone of decisional independence for ALJs, were of so little concern to the public at large that they should not be subject to notice and comment rulemaking. See S. Rep. No. 79-752, at 30 (1945) ("[T]here are certain provisions which touch on subjects long regarded as of the highest importance . . . such as the separation of examiners from the agencies they serve . . . ."). The public would seem to have at least as much interest in the subject as it has in whether federal employees may participate in partisan elections. Moreover, exceptions to the notice and comment requirements of the APA should be narrowly construed. Joseph, 554 F.2d at 1153 n.23 ("Section 553(a)(2) must be

narrowly construed . . . ."); <u>see also</u> <u>Alcaraz v. Block</u>, 746 F.2d 593, 612 (9th Cir. 1984) ("The exceptions to section 553 will be narrowly construed and only reluctantly countenanced." (quotation marks and citation omitted)). Thus, the regulation at issue cannot be exempted from notice and comment rulemaking as merely relating to agency personnel.

Next, we must consider whether the exemption in section 553(b)(A) excluding "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" from the requirements of section 553 applies to section 1201.142. In <u>Chrysler Corp. v. Brown</u>, the Supreme Court described a substantive, or legislative, rule—as opposed to an interpretive rule—as "one 'affecting individual rights and obligations.'" 441 U.S. 281, 302 (1979) (quoting <u>Morton v. Ruiz</u>, 415 U.S. 199, 232 (1974)). The Supreme Court went on to say that "[t]his characteristic is an important touchstone for distinguishing those rules that may be 'binding' or have the 'force of law.'" <u>Id.</u> In <u>Hamlet v. United States</u>, 63 F.3d 1097, 1105 n.6 (Fed. Cir. 1995), this court said that "procedural requisites in manuals or handbooks for the removal of an agency employee, such as the procedural requirements held to be binding in <u>Service v. Dulles</u>," were substantive rules. This court then held that the regulation at issue was substantive because "it purports to create a reinstated employee's right to receive backpay." <u>Id.</u> at 1106. Similarly, the requirements that the Supreme Court held to be binding in <u>Service v. Dulles</u>, 354 U.S. 363, 373-75 (1957), related to the Secretary of State's ability to remove an employee due to the Secretary's concern that the employee posed a loyalty or security risk. Thus, section 1201.142, granting an ALJ a right to bring an action

before the Board for constructive removal, certainly affects individual rights and would seem to be at least as much a substantive rule as those in the above cases.

The Board, however, argues that it promulgated section 1201.142 under the authority of 5 U.S.C. § 1204(h), providing authority for the Board "to prescribe such regulations as may be necessary for the performance of its functions," and that to the extent that the regulation describes the Board's jurisdiction over constructive removals, it can be no more than an interpretive rule. The Board argues that it lacks delegated authority to promulgate legislative rules determining the scope of its jurisdiction. The Board's position on this issue lacks any merit. When published for notice and comment, the notice of proposed rulemaking including section 1201.142 referred to 5 U.S.C. §§ 1204 and 7701 as authority for the regulation. 62 Fed. Reg. 48449, 48451 (Sept. 16, 1997). The Board's assertion that the notice only referred to section 1204(h) is clearly incorrect. We need not decide the extent of the Board's authority to promulgate regulations governing its jurisdiction under section 7701, because 5 U.S.C. § 1305 states that "for the purpose of section 7521 of this title, the Merit Systems Protection Board may . . . prescribe regulations . . . ." To the extent there is doubt that the Board has jurisdiction to prescribe regulations governing its jurisdiction under section 7701, section 1305 expressly provides the Board with authority to prescribe regulations governing the provisions of section 7521, which is precisely what section 1201.142 does. While section 1305 was not expressly listed in the statutory authority for the promulgation of section 1201.142, this lack of notice was not prejudicial. See Trans-Pacific Freight Conference of Japan/Korea v. Fed. Mar. Comm'n, 650 F.2d 1235, 1259 (D.C. Cir. 1980) ("Although the Commission technically was not in compliance with

section 4(b)(2), we believe that the defect in the notice of proposed rulemaking was not fatal.").

Because section 1201.142 is a substantive rule not subject to the exemption in section 553(b)(A) and because it is not subject to the agency management or personnel exception of section 553(a)(2), the Board could only repeal the rule through the notice and comment procedures required by section 553(b). United States v. Nixon, 418 U.S. 683, 695-96 (1974) ("So long as this regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it."); Am. Fed'n of Gov't Employees, AFL-CIO, Local 3090 v. Fed. Labor Relations Auth., 777 F.2d 751, 758-60 (D.C. Cir. 1985) ("[U]nless and until it amends or repeals a valid legislative rule or regulation, an agency is bound by such a rule or regulation."); see also United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267-68 (1954) (holding that the Attorney General may not act in contravention of valid regulations "as long as the regulations remain operative").

The Board and the Agency argue that an exception to the general rule that an Agency is bound by its own rules applies where the rule is inconsistent with a statute. See Am. Tel. & Tel. Co. v. Fed. Communications Comm'n, 978 F.2d 727, 733 (D.C. Cir. 1992) ("[T]hen Judge Scalia, concurring in American Federation of Government Employees, recognized that in some situations, when an agency declines to apply its own rule in an adjudication 'we would be justified [on appeal] in looking beyond the defect of inconsistency, to affirm an adjudication on the ground that its result was mandated by statute and that the conflicting rule was simply unlawful.'" (quoting Am. Fed. of Gov't Employees, 777 F.2d at 760 (Scalia, J., concurring)) (alteration in

original)). However, the argument that section 1201.142 is inconsistent with section 7521 is foreclosed by our decisions in <u>Sannier</u> and <u>Stephens</u>. Thus, this exception does not apply.

Based on the foregoing, we must conclude that the Board lacked authority to overrule section 1201.142 by adjudication. That conclusion does not foreclose the Board from repealing the rule in accordance with section 553(b). However, for purposes of the present case, the Board must adhere to its legislative rule.

## III. CONCLUSION

Because Tunik's appeal is moot and was moot before the Board, we vacate the Board's opinion in his case and remand with instructions to dismiss the appeal. Because the Board violated the APA in attempting to overturn its regulation through adjudication in the remaining cases, we reverse the Board's dismissals in those cases and remand for further proceedings consistent with this opinion.

<u>REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED</u>

# United States Court of Appeals for the Federal Circuit

03-3286, -3330, -3331

LLOYD L. TUNIK,

Petitioner,

and

VERRELL DETHLOFF, THOMAS S. ROBINSON, MARGUERITE SCHELLENTRAGER, KAREN BAKER, BRYAN BERNSTEIN, and TELA L. GATEWOOD

Petitioners,

and

JOSEPH SCHLOSS,

Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent,

and

SOCIAL SECURITY ADMINISTRATION,

Intervenor.

SCHALL, <u>Circuit Judge</u>, dissenting.

The court's opinion represents a thorough analysis of the issues in this case. However, I am unable to agree with the majority that the Merit Systems Protection Board ("Board") may not, by adjudication, overrule <u>In re Doyle</u>, 29 M.S.P.R. 170 (1985),

and declare invalid 5 C.F.R. § 1201.142, the regulation embodying the holding of Doyle. As explained below, in my view Doyle and the attendant regulation are contrary to 5 U.S.C. § 7521 (2000). For that reason, assuming the exceptions of 5 U.S.C. § 553 do not apply, I still do not think that we should reverse the decision of the Board on the ground that the Board failed to go through an Administrative Procedure Act ("APA") notice-and-comment rule-making process to formally repeal the regulation. Accordingly, I would affirm the decision of the Board. I therefore respectfully dissent.

I.

In accordance with 5 U.S.C. § 7521, an agency may take certain "actions" against an administrative law judge ("ALJ") "only for good cause established and determined by the [Board] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). The statute goes on to state:

> The actions covered by this section are—
> (1) a removal;
> (2) a suspension;
> (3) a reduction in grade;
> (4) a reduction in pay; and
> (5) a furlough of 30 days or less[.]

Id. § 7521(b). In short, under the statute, an employing agency may not remove an ALJ, suspend an ALJ, reduce an ALJ's grade, reduce an ALJ's pay, or put an ALJ on a furlough of 30 days or less, without first establishing before the Board good cause for the action.

In Doyle, the Board addressed the issue of whether it had jurisdiction over a claim of constructive removal under section 7521 even though the statute refers simply to "removal." The case arose from, among other things, Judge Doyle's allegation that his employing agency, the Department of Health and Human Services ("HHS"),

03-3286, -3330, -3331                                    2

constructively removed him from his position as an ALJ when it refused to approve his $350 travel voucher.  Doyle, 29 M.S.P.R. at 171-72.  The Board noted that while "constructive removal" was not one of the actions expressly covered by section 7521, "removal" had consistently been interpreted so as to protect ALJs from agency actions that might impair the ALJ's "qualified judicial independence."  Id. at 174.  More particularly, the Board viewed our predecessor court's decision in Benton v. United States, 488 F.2d 1017 (Cl. Ct. 1973), as support for the proposition that section 7521 applies to both direct and indirect actions that undermine an ALJ's qualified judicial independence:

> Consistent with the court's position in Benton, the Board also recognizes the possibility of an agency's constructively removing an administrative law judge by cumulative administrative actions or active intervention in a manner calculated to prevent the impartial exercise of his judicial functions. . . .  Whether the Board takes jurisdiction over an action as a "constructive removal" within section 7521 depends on the sufficiency of the allegations in showing that the challenged action has a pernicious effect on the complaining judge's qualified independence.

Doyle, 29 M.S.P.R. at 175.  Under this standard, the Board ultimately concluded that Judge Doyle, who remained employed as an ALJ with HHS, had not presented allegations sufficient to invoke the Board's jurisdiction.  It therefore dismissed his complaint.  Id.

II.

Until its decision in Tunik v. Social Security Administration, 93 M.S.P.R. 482 (2003), the Board continued to apply the Doyle standard to constructive removal claims brought under 5 U.S.C. § 7521.  See, e.g., White v. Soc. Sec. Admin., 76 M.S.P.R. 447, 453 n.3 (1997); Bennett v. Soc. Sec. Admin., 72 M.S.P.R. 116, 119-20 (1996); Lawson

v. Dep't of Health & Human Servs., 64 M.S.P.R. 673, 678 (1994). In addition, the Board promulgated a regulation, 5 C.F.R. § 1201.142, embodying the holding in Doyle. The regulation provides:

> An [ALJ] who alleges that an agency has interfered with the judge's qualified decisional independence so as to constitute an unauthorized action under 5 U.S.C. [§] 7521 may file a complaint with the Board under this subpart.

5 C.F.R. § 1201.142 (2003).

In Tunik, the Board reconsidered the issue and concluded that its holding in Doyle was inconsistent with section 7521. In particular, the Board concluded that section 7521 conferred jurisdiction over constructive removal claims only if the ALJ first showed actual separation from his ALJ position with the agency. Tunik, 93 M.S.P.R. at 493. Separation, the Board held, could be established by showing that the agency separated or reassigned the ALJ from his position as an ALJ or by showing that the decision of the ALJ to leave his position was involuntary. Id. The Board determined that, under this standard, it lacked jurisdiction over Judge Tunik's constructive removal claim because he remained in his position as an ALJ with the Social Security Administration ("SSA"). Id.

The Board recognized that its decision required overturning Doyle and invalidating 5 C.F.R. § 1201.142, but it concluded that such action was justified because Doyle was not consistent with 5 U.S.C. § 7521. In reaching this conclusion, the Board first noted that Congress used almost identical language in listing covered actions under 5 U.S.C. § 7521 and 5 U.S.C. § 7512 (2000).[1] Tunik, 93 M.S.P.R. at 486. In that

---

[1] Section 7512 of title 5 lists the actions that an "employee" of an agency may appeal to the Board. It states that the covered actions are:

regard, the Board pointed out that in Butler v. Social Security Administration, 331 F.3d 1368 (Fed. Cir. 2003), this court held that "section 7521 must be construed consistently with its sister provision, section 7512," which has been interpreted to require actual separation. Tunik, 93 M.S.P.R. at 486-87 (quoting Butler, 331 F.3d at 1372). The Board stated that its conclusion was also consistent with the ordinary meaning of "removal"—"to be separated from one's position of record or not to have a continuing appointment to that position." Id. at 487.

The Board also determined that Doyle's reliance on Benton v. United States, 488 F.2d 1017 (Ct. Cl. 1973), was misplaced. That was because, the Board said, Benton did not involve a situation where the ALJ filed a constructive removal claim yet retained his position as an ALJ. Rather, the case involved a constructive removal claim based on an allegation of involuntary retirement, an allegation over which the Board would also have jurisdiction under section 7512 (if brought by a qualifying "employee"). Tunik, 93 M.S.P.R. at 488. The Board further determined that the legislative history discussed in Benton, relating to section 11 of the APA, indicated that Congress intended "removal" to mean "separation." Id. at 489.[2] Further, the Board noted that Benton also relied on a

_____

(Cont'd. . . .)
        (1) a removal;
        (2) a suspension for more than 14 days;
        (3) a reduction in grade;
        (4) a reduction in pay; and
        (5) a furlough of 30 days or less[.]
5 U.S.C. § 7512.

[2] Specifically, the legislative history cited in Benton states that section 11 of the APA was intended to make hearing examiners "'removable only for good cause determined by the Civil Service Commission [CSC], after opportunity for a hearing,' and that the CSC must 'afford any examiner an opportunity for a hearing before acceding to an agency request for removal.'" Tunik, 93 M.S.P.R. at 489 (quoting Benton, 488 F.2d at 1021-22) (emphases added).

CSC regulation which defined "removal" as "an involuntary change in the status of an [ALJ], including discharge, demotion, and suspension from the position of [ALJ] and demotion, reassignment, and promotion, to a position other than that of [ALJ]." Id. (quoting 5 C.F.R. § 930.202(f) (1973)). In short, the Board determined that the Benton decision was really concerned about the procedures that must be followed before separating an individual from his or her position as an ALJ. Id. Accordingly, the Board held that its decision in Doyle "went beyond the Benton decision, the legislative history [of the APA], and the CSC regulations to create a class of appealable 'removal' actions which have nothing to do with being separated from the position of ALJ." Id.

The Board also determined that Doyle was inconsistent with 5 C.F.R. § 930.202(f) (2003), a regulation of the Office of Personnel Management ("OPM") implementing section 7521. The regulation defines "removal" as the "discharge of an [ALJ] from the position of [ALJ] or involuntary reassignment, demotion, or promotion to a position other than that of [ALJ]." 5 C.F.R. § 930.202(f). Therefore, the Board concluded, "[i]f we continue to adhere to the Doyle theory of constructive removal, we would effectively be invalidating the OPM regulations which implemented section 7521." Id.

Finally, the Board concluded that our decision in Sannier v. Merit Systems Protection Board, 931 F.2d 856 (Fed. Cir. 1991), was not a bar to its decision to overrule Doyle. First, the Board stated that it was free to address issues involving its own jurisdiction. Tunik, 93 M.S.P.R. at 490. Second, the Board noted that, in recognizing the existence of constructive removal claims, Sannier relied on Schultz v. United States Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987), a case involving a claim of

involuntary resignation under section 7512.  Tunik, 93 M.S.P.R. at 491.  This, the Board stated, indicated that constructive removal claims involving ALJs require actual separation.  Id.  Third, the Board determined that in Sannier we merely "recognized" the Doyle theory of jurisdiction over constructive removal claims.  Id.  We did not, according to the Board, "necessarily endorse" the concept created in Doyle.  Id.  The Board concluded that, under such circumstances, our decision in Watson v. Department of the Navy, 262 F.3d 1292 (Fed. Cir. 2001), allowed it to reconsider and overrule its earlier decision and to invalidate the regulation.  Tunik, 93 M.S.P.R. at 491-92.

### III.

The majority holds that, under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Board's interpretation of "removal" to require actual separation is consistent with 5 U.S.C. § 7521 because the statute is ambiguous and the Board's interpretation is reasonable.[3]  The majority states that our decisions in Sannier and in Stephens v. Merit Systems Protection Board, 986 F.2d 493 (Fed. Cir. 1993), ordinarily would not bar the Board from overruling its prior interpretation because those two cases were decided based on Chevron deference to the Board's decision in Doyle.  In this case, however, the majority holds that the process for overturning Doyle, which the majority states represented a reasonable interpretation of the statute, supra at 18, is complicated by the Board's regulation codifying Doyle at 5 C.F.R. § 1201.142.  Specifically, the majority states, and I agree, that the APA does not generally permit an agency to repeal a regulation without following the Act's notice-and-comment process.

---

[3]  As indicated in Part IV below, it is my view that the language of section 7521 is clear.

03-3286, -3330, -3331                                7

The majority, I think, acknowledges, and I agree, that there are situations in which an agency's action invalidating a regulation it determines is contrary to statute, without notice and comment, will be excused. See supra Part II.B.3, citing Am. Tel. & Tel. Co. v. Fed. Communications Comm'n, 978 F.2d 727, 733 (D.C. Cir. 1992). However, the majority concludes that that proposition does not apply in this case because our intervening decisions in Sannier and Stephens recognized the Doyle theory, and therefore 5 C.F.R. § 1201.142, as a reasonable interpretation of section 7521. Thus, the majority concludes, the Board's decision invalidating 5 C.F.R. § 1201.142 without following the notice-and-comment process of the APA must be reversed. It is this aspect of the majority opinion with which I disagree.

IV.

I start from the premise that an agency may not promulgate a regulation that is contrary to statute. See United States v. Mead Corp., 533 U.S. 228, 227 (2001); Chevron, 476 U.S. at 842-45. And, in this case, I think the Board correctly determined that 5 C.F.R. § 1201.142 is contrary to the plain language of 5 U.S.C. § 7521. Additionally, I do not think this court ever determined that Doyle was a reasonable interpretation of section 7521. Therefore, I am unable to agree with the majority that the Board's failure to issue notice and comment before overruling Doyle and invalidating 5 C.F.R. § 1201.142 requires reversal.

Turning first to the language of the statute, I think the ordinary meaning of "removal" entails "separation" from one's current position of employment. Benton, 488 F.2d at 1020 ("In the ordinary sense, the word 'removal' denotes an involuntary separation of the employee from his position."); Black's Law Dictionary 1322 (8th ed.

2004) ("The transfer or moving of a person or thing from one location, position, or residence to another."). In addition, Congress chose to define covered actions under 5 U.S.C. § 7521 with language almost identical to that used in 5 U.S.C. § 7512, which pertains to action taken against certain federal "employees":

> This subchapter applies to—
> (1) a removal;
> (2) a suspension for more than 14 days;
> (3) a reduction in grade;
> (4) a reduction in pay; and
> (5) a furlough of 30 days or less[.]

Consequently, we have held that the similarity of the two statutes dictates that they be construed in the same manner. Butler, 331 F.3d at 1372 ("We conclude that section 7521 must be construed consistently with its sister provision, section 7512."). Moreover, while we have recognized constructive removal claims under section 7512, we, and the Board, have only done so where the employee shows actual separation from the agency. See, e.g., Shoaf v. Dep't of Agric., 260 F.3d 1336, 1341 (Fed. Cir. 2001) ("The [Board] possesses jurisdiction over an appeal filed by an employee who has resigned or retired if the employee proves, by a preponderance of the evidence, that his or her resignation or retirement was involuntary and thus tantamount to forced removal. That is, an involuntary resignation constitutes a constructive removal that is appealable to the [Board]." (citation omitted)); Gutierrez v. United States Postal Serv., 90 M.S.P.R. 604, 607 (2002) ("An employee-initiated action such as a resignation or a retirement is not appealable to the Board unless the appellant proves that it was involuntary and thus constituted a constructive removal."). Accordingly, I think Doyle

was wrong in suggesting that the Board could have jurisdiction over constructive removal claims where the ALJ was not separated from the agency.[4]

I think the Board's principal error in Doyle was its misplaced reliance on Benton. The Board initially cited Benton as support for the proposition that, although not expressly recognized in 5 U.S.C. § 7521, the Board has jurisdiction over constructive removal claims. Doyle, 29 M.S.P.R. at 174. I agree with this statement of the law. See Benton, 488 F.2d at 1022. However, the Board subsequently proceeded to create a new standard for establishing a constructive removal claim, a standard that did not require removal. The Board further stated that this new standard was "[c]onsistent with the court's position in Benton." This, I submit, is simply not correct.

That is because Benton involved a claim of constructive removal based on an allegation of involuntary retirement, i.e., the employee was no longer with the agency. Benton, 488 F.2d at 1019 (stating that the issue before the court was "whether Section 11 of the APA, which requires a hearing[,] as prescribed in that Act[,] for the removal of a Federal hearing examiner, applies to the [CSC's] involuntary removal and retirement of a hearing examiner on a disability annuity under the Civil Service Retirement Act" (footnote and citation omitted)). Furthermore, although recognizing that the CSC had jurisdiction over constructive removal claims, the Court of Claims never suggested that a constructive removal could occur without a showing of actual separation from the agency. On the contrary, the court stated that "[i]n the ordinary sense, the word 'removed' denotes an involuntary separation of the employee from his position." Id. at 1020 (emphases added).

---

<sup>4</sup>    I say "suggesting" because, in Doyle, the Board ultimately concluded that the ALJ had not alleged a constructive removal claim.

03-3286, -3330, -3331                    10

The legislative history of section 11 of the APA, on which the Benton court relied, shows that Congress intended to give hearing examiners (now known as ALJs) protections beyond those afforded other employees. That objective, however, was met by the good cause requirement. Nothing indicates that Congress intended "removal" to mean anything other than "separation." Indeed, the legislative history states that the CSC "must afford any examiner an opportunity for a hearing before acceding to an agency request for removal . . . ." S. Doc. No. 248, 79th Cong., 2d Sess. 215 (1946) (emphasis added); see also Benton, 488 F.2d at 1022.

Prudential considerations also favor interpreting "removal" as requiring actual separation from the ALJ position. Otherwise, the employing agency may be hesitant to undertake many day-to-day managerial activities without first obtaining clearance from the Board through the good-cause procedure set forth at 5 U.S.C. § 7521(a). For example, in this case Judge Tunik alleged constructive removal based on various memoranda circulated between Chief Administrative Law Judges at the SSA. Tunik, 93 M.S.P.R. at 484. One of these memoranda related to a requirement that Judge Tunik receive case-processing training. Id. The majority's recognition of Doyle as a reasonable, and, for the time being, binding, interpretation of section 7521 may make agencies reluctant to circulate such standard memoranda without first establishing good cause before the Board (and after providing the affected ALJ with an opportunity for a hearing). I find it difficult to believe that Congress had such a cumbersome scheme in mind when it enacted 5 U.S.C. § 7521.

In sum, I think Doyle gave an impermissible meaning to "removal" and to our predecessor court's decision in Benton. The plain meaning of "removal" requires

separation. I thus think the Board correctly determined in Tunik that it lacked jurisdiction in this case. Therefore, the Board's failure to go through a notice-and-comment process before invalidating 5 C.F.R. § 1201.142 does not require reversal of the Board's decision. See Am. Tel. & Tel. Co., 978 F.2d at 733 ("We have never held . . . that an agency is obliged to apply a rule in an adjudicatory context if intervening events indicate that the rule is unlawful."); see also Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth., 777 F.2d 751, 760 (D.C. Cir. 1985) (Scalia, J., concurring) ("Perhaps there are situations in which we would be justified in looking beyond the defect of inconsistency [with the APA's notice-and-comment procedure], to affirm an adjudication on the ground that its result was mandated by statute and that the conflicting rule was simply unlawful."). I think that bypassing the procedures of notice and comment is especially justified in this case, where the regulation at issue relates to the Board's jurisdiction. See New York v. F.E.R.C., 535 U.S. 1, 18 (2002) ("'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" (citation omitted)).

Sannier and Stephens do not change my conclusion. The majority reasons that Sannier and Stephens recognized the Doyle interpretation as reasonable and, therefore, preclude us from now finding it inconsistent with section 7521. I disagree. In my view, neither Sannier nor Stephens presented us with the question of whether the Doyle interpretation of 5 U.S.C. § 7521 was reasonable. Both cases merely asked us to review the Board's conclusion that the petitioners had not sufficiently alleged that their employing agencies had interfered with their qualified judicial independence. More importantly, in both cases we affirmed. Therefore, because the Board lacked

03-3286, -3330, -3331                    12

jurisdiction in both cases even under the more lenient standard of Doyle, we were not asked to reach the issue of whether the Board had jurisdiction over a constructive removal claim where the ALJ was not actually separated from the agency. See Watson v. Dep't of the Navy, 262 F.3d 1292, 1301-02 (Fed. Cir. 2001) (holding that we were not bound by our prior decision in Bingaman v. Department of the Treasury, 127 F.3d 1431 (Fed. Cir. 1997), because that case, while recognizing the Board's approach, did not actually adopt it).

The majority, on the other hand, contends that "Sannier and Stephens adopted and applied the Board's Doyle standard." Supra, at 14. Admittedly, in both cases we quoted relevant portions from the Doyle holding, but I do not think we ever decided whether the Doyle holding was correct. I would also agree that we applied Doyle to the extent we affirmed the Board's findings of no jurisdiction based on the fact that the petitioners had not shown interference with their qualified judicial independence. However, because we affirmed a finding of no jurisdiction, the facts of those two cases did not present us with the issue of whether jurisdiction could be established without showing actual separation. In other words, in neither Sannier nor Stephens was it necessary to address the issue of separation given that the petitioners did not even satisfy the more lenient standard of Doyle. See Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

For the foregoing reasons, I do not see reversible error in the Board's decision overruling its erroneous interpretation in Doyle and invalidating 5 C.F.R. § 1201.142

without following the notice-and-comment process of the APA. I thus would affirm the decision of the Board. I therefore respectfully dissent.